20543.    MARTIN, Caveatrix, *v.* BALDWIN, Executor.

Argued July 13, 1959—Decided September 11, 1959.

*Lippitt & Lippitt,* for plaintiff in error.

*W. L. Ferguson, Joe M. Ray, Jesse G. Bowles,* contra.

MOBLEY, Justice. ■ The caveatrix offered in evidence the complete file of Dr. James J. Martin with the Veterans' Administration, which was identified by an employee of the Veterans' Administration as the file containing all original records of this veteran with the Veterans' Administration. These documents consume eighty pages of the record in this case, and contain an application for disability compensation filed by Dr. Martin with the Veterans' Administration on May 27, 1927; Veterans' Administration hospital records; letters addressed "to whom it may concern," giving information about certain physical aspects of Dr. Martin over a number of years, signed by named persons with the letters "M. D." following their signatures; reports of rating boards of the Veterans' Administration; reviews on appeal of these reports; and various other material. This file was offered as a whole, was objected to and was properly excluded by the court, as many of the documents were inadmissible. Sufficient to demonstrate the inadmissibility of this evidence is the following letter dated July 20, 1927, at Atlanta, Georgia, and addressed "To whom it may concern," and stating over the signature of H. C. Crawford, M. D., the following: "This is to certify that Dr. J. J. Martin of 436 Peachtree was under my professional care during the year of 1926 at which time he was suffering from acute tonsillitis. I have treated him once or twice since for impacted cerumen in ear." In a similar letter dated July 19, 1927, Dr. M. T. Harrison stated that he had treated Dr. Martin for influenza on July 24 and 25, 1926. Clearly, this evidence is of no probative value in determining whether Dr. Martin at the time he executed his will on February 27, 1958, was insane, suffering from monomania or acting under undue influence of Ernest Baldwin, Jr. Furthermore, there is

no evidence that these statements were furnished the Veterans' Administration by Dr. Martin or at his request, nor were they a "memorandum or record of any act, transaction, occurrence, or event" made in the regular course of business by the Veterans' Administration within the meaning of the act approved February 15, 1952 (Ga. L. 1952, pp. 177, 178; Code, Ann. § 38-711), under which act the plaintiff in error contends that this evidence is admissible. Various other items contained in the file were not admissible in evidence for reasons hereafter stated.

■ (a) After the exclusion of the Veterans' Administration file in its entirety, each individual document from that file was then offered in evidence. The claim for disability compensation, which was signed by Dr. Martin, was admitted without objection, and certain travel orders were admitted, as was a letter from Dr. Longino, which indicated that it was sent in at the request of Dr. Martin. All others were excluded.

The contention that the excluded documents were admissible because submitted to the Veterans' Administration by Dr. Martin in support of his claim for disability compensation is without merit, since there is no evidence that Dr. Martin submitted them, since the file does not indicate how they got there, and since the witness who produced them for the Veterans' Administration did not know who submitted them.

■ A number of letters from persons signing as medical doctors, such as those described supra from Dr. Crawford and Dr. Harrison, which were in the Veterans' Administration file, with no evidence as to how they came to be in the file, were not admissible under Code (Ann.) § 38-711, as they are not a "memorandum or record of any act, transaction, occurrence or event," made in the regular course of business by the Veterans' Administration. If it could be said to be a memorandum or record of any act, etc., made by the writer of the letter, it would not be admissible, for there is no testimony that it was such and made in the regular course of business by him. Some of the letters were otherwise objectionable for reasons set forth in the following division.

■ Another class of testimony excluded included original

records of the Veterans' Administration hospital and of the Veterans' Administration office, made in the regular course of business of the hospital or Veterans' Administration office handling the veterans' claims for compensation. Each of these records excluded contained either opinion evidence, conclusions, impressions, matters of conjecture, or diagnoses of physicians or other parties. The question presented is whether such evidence is admissible under Code (Ann.) § 38-711, which provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event shall be admissible in evidence in proof of said act, transaction, occurrence or event, if the trial judge shall find that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include every kind of business, profession, occupation, calling, or operation of institutions, whether carried on for profit or not. This section shall be liberally interpreted and applied."

The Court of Appeals in a well-reasoned opinion (*Knudsen* v. *Duffee-Freeman, Inc.*, 95 *Ga. App.* 872, 99 S. E. 2d 370), held that a letter written by one who purported to be a physician to the United States Employees' Compensation Commission, which contained a diagnosis of the plaintiff's mental condition as a malingerer, was not admissible, saying in part (p. 879): "Code § 38-1710 provides that the opinion of an expert witness is admissible when based upon the proven facts of the case, and our courts have uniformly held that for the testimony of an expert witness to be received, his qualification as such must be first proved. *Alabama Great Southern R. Co.* v. *McBrayer*, 65 *Ga. App.* 153, 157 (5) (15 S. E. 2d 563); *Flemister* v. *Central Ga. Power Co.*, 140 *Ga.* 511, 512 (3) (79 S. E. 148). If that prerequisite is not met the opinion of the expert must be excluded. In *Glover* v. *State*, 129 *Ga.* 717, 718 (9) (59 S. E. 816),

it was held that the witness was not necessarily an expert in a particular field of science or skill because he professed to be, nor did it necessarily follow that he was not qualified to testify as an expert because he himself was of the opinion that he was not entitled to be so accredited.

"Code § 38-1705 provides: 'The right of cross-examination, thorough and sifting, shall belong to every party as to the witnesses called against him.'

"To construe Code § 38-711 to permit the admission in evidence of a letter in which is contained the diagnosis of a party's condition by a witness concerning whose qualification as an expert there is no evidence, and a memorandum opinion not signed by any person but simply enclosed in the letter, when the party in whose interest the letter and memorandum opinion are offered is not afforded the opportunity to examine either the author of the letter or the maker of the memorandum would in effect repeal Code § 38-1705 and ignore opinions of our Supreme Court and of this court. Indeed, such an interpretation would mean that the new statute supersedes practically our whole system of jurisprudence."

The General Assembly thereafter adopted a resolution (Ga. L. 1958, pp. 542-544, approved March 25, 1958), declaring the legislative intent with respect to interpretation of Code (Ann.) § 38-711, wherein it pointed out that the Court of Appeals in the *Duffee-Freeman* case seriously limited the meaning of said act, and declaring that its intention in the adoption of said section was that it should have a liberal interpretation so that records ". . . made in the ordinary course of business and made as a memorandum or record of an event at or near the time it occurred, or within a reasonable time thereafter, would be admissible in evidence without the necessity of producing the party or parties who made such entries, provided such records are properly vouched for as provided in Code section 38-711, and that such records shall be admissible in the trial of all cases even though the right of cross-examination is denied by the application and effect of said Code section 38-711." The Court of Appeals has, since the adoption of this resolution, followed the *Duffee-Freeman* case in *Hawkins* v. *Jackson*, 97 *Ga. App.* 525, 528 (103 S. E. 2d 634).

The resolution made no change in Code (Ann.) § 38-711, but merely declared the legislative intent. This "is clearly an attempt by the legislature to perform a judicial function by construing a law, and offends article 1, section 1, paragraph 23 of the Constitution of this State (Code § 2-123), and is void." *McCutcheon* v. *Smith,* 199 *Ga.* 685 (2) (35 S. E. 2d 144).

Code (Ann.) § 38-711 is, in substance, an enactment of the "Uniform Business Records as Evidence Act," which was prepared by the Commissioners on Uniform State Laws and adopted with variations by a number of the States. There is a similar Federal statute, 28 U. S. C. A. 473, § 1732. Various interpretations have been given these statutes by the Federal courts and the courts of several states.

. In New York Life Ins. Co. *v.* Taylor, 147 F. 2d 297, 300, the court, dealing with the question of admissibility of records containing conclusions of the doctor that the deceased died as a result of suicide, in referring to the Federal statute, said: "In this case the records are not offered to prove routine facts such as the date of admission to the hospital, the names of the attending physicians, etc. They are offered to prove the truth of accounts of events and of complicated medical and psychiatric diagnoses. The accuracy of such accounts is affected by bias, judgment, and memory; they are not the routine product of an efficient clerical system. There is here lacking any internal check on the reliability of the records in this respect, such as that provided for 'payrolls, accounts receivable, accounts payable, bills of lading and the like.' The Supreme Court has stated that the test of admissibility must be 'the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation.' To admit a narrative report of an event, or a conversation, or a diagnosis, as a substitute for oral testimony, is to give any large organization the right to use self-serving statements without the important test of cross-examination. Cross-examination is unimportant in a case of systematic routine entries made by a large organization where skill of observation or judgment is not a factor." See also the quotation from that case in *Knudsen* v. *Duffee-Freeman, Inc.,* supra, at page 880.

300

In Lykes Bros. S. S. Co. *v.* Grubaugh, 128 F. 2d 387, 390 (Fifth Circuit), the court in dealing with the question of admission of a hospital report under the Federal statute said: "The conclusion in the hospital report that plaintiff was fit for work was correctly excluded. The statute making such reports evidence, merely accredits the facts that they contain, it does not purport to make opinions admissible as evidence."

In an opinion written by Judge Sibley in the Fifth Circuit Court of Appeals case of England *v.* United States, 174 F. 2d 466, 468, the court held: "The evidence as to England's capacity to commit crime was in conflict. There was offered in his behalf, bound together under one certificate, thirty-three sheets purporting to be photostatic copies of hospital records and medical reports concerning England while he was in Navy hospitals between March, 1945, and March 20, 1946, when he was recommended for honorable discharge from the Navy. The documents so bound together were offered as a whole, objected to as a whole as hearsay, and ruled out as a whole. It is now urged that they are admissible under 28 U. S. C. A. § 1732 as contemporaneous records 'made in the course of any business'. . . The Navy hospitals may be said to be conducting a business within the meaning of Sect. 1732, so that the routine record of what is done with or to or for a patient is admissible. But some of the documents are England's account of his past life and are clear hearsay. Others are opinions of individual physicians, based on this past history, on his repeated absences without leave, resulting in his being tried four times by courts-martial, and on their own experience with him, the conclusion being that he suffered from 'mental deficiency, (organic brain disease)'. These we think are not contemporaneous records of events, but are expert opinions based in part on hearsay, with no opportunity for cross-examination."

In addition, see Lyles *v.* United States, 254 F. 2d 725, 731, where it is stated: "The difference between a 'fact' (such as an act, transaction, occurrence or event) and an 'opinion' is one of the fundamental differences in the law of evidence. A fact can be testified to by any witness, but, with a few exceptions, an opinion can be given in evidence only by an expert, and the qualifications as an expert and reasons for his opinion are part

of the premise for allowing him to testify. The Shop Book Act deals essentially with facts. . . To submit to a jury a written notation of a medical opinion upon a complex and difficult matter, without presentation of any witness and without cross-examination of the author of the opinion, would be to submit as a fact the medical conclusion of a doctor without inquiry, showing, or cross-examination as to his qualifications, the data upon which he rested his opinion, or the reasoning by which he reached his conclusion. That is the vice of submitting to a jury, without a witness, hospital notations of mere opinion. Gross injustice and error could easily ensue from such a course."

We are of the opinion that the reasoning of the Court of Appeals (*Knudsen* v. *Duffee-Freeman, Inc.,* supra) and in the cases from which we have quoted is sound, and that diagnoses and medical opinions of persons purporting to be physicians, without proof of their qualifications, and other opinions, conclusions, impressions, and matters of conjecture appearing in the records, do not constitute a memorandum or record of any act, transaction, occurrence, or event as contemplated by Code § 38-1710. As said by Judge Sibley, they are not contemporaneous records of events. They are not facts as are the "routine record of what is done with or to or for a patient" (England *v.* United States, supra) in a hospital or other place. A fact can be testified to by any witness, but opinions can be given only by experts or by nonexperts under prescribed conditions. It is unthinkable that an opinion entered in a hospital record or other record would be admissible in evidence when that same opinion could not be given on the witness stand unless and until the witness qualified as an expert. To admit the opinions of experts without their qualifications having first been determined by the court would be in violation of Code § 38-1710 and decisions of this court. *Glover* v. *State,* supra; *Williams* v. *Trust Co. of Ga.,* 180 *Ga.* 73 (2) (178 S. E. 295). Furthermore, records offered not to prove routine facts such as date of admission to hospital, names of physicians, observable data, etc., but complicated medical diagnoses, the accuracy of which is affected by knowledge, or lack of knowledge, bias, judgment, memory, etc., are lacking in that reliability of records which exists in routine recording of facts in regular business books or other records.

(d)   The court properly excluded a photostatic copy of the Army discharge of Dr. Martin and Army clinical records which were produced from the file of the Veterans' Administration. Neither of these documents was admissible under the act approved February 7, 1950 (Ga. L. 1950, pp. 73, 74; Code, Ann., § 38-710), and Code (Ann.) § 38-711, as a memorandum or record of an act, occurrence, or event of the Veterans' Administration, as they obviously were records or memoranda of the Defense Department and not of the Veterans' Administration, and were not offered as a memorandum or record of an act, occurrence, or event of that department, but of the Veterans' Administration.   There was no proof that they were records of the Defense Department made in the regular course of business.

■   Certain microfilms of original records of the University Hospital in Augusta were admitted in evidence.   A typewritten copy of the matter contained in the films made by the witness was excluded upon her testimony that the copy was not a true and correct copy of the films, as she was unable to read portions of it, one part being the name of one of the doctors.   This not being a true and correct copy of what was in the films, the court properly excluded it.

■   The court properly excluded the records of Dr. Hervey M. Cleckley, as there was no evidence offered that they were the records of Dr. Cleckley made in the regular course of his business as a physician, but were mailed to the clerk of the Randolph Superior Court with an affidavit from Dr. Cleckley that they were his records.   "Preliminary proof is necessary before the writing or record is admissible under this exception [Code (Ann.) § 38-711].   The evidence should include identification of the writing or record by a witness who is familiar with the method of keeping the records and who can testify thereto and to facts which show that the entry was made in the regular course of business and that it was the regular course of the business to make such memorandum or record at the time of the event or within a reasonable time thereafter."   Thomas F. Green, Jr., *The Georgia Law of Evidence*, p. 619, § 313.   See cases cited therein.

■   The caveatrix testified that, "During those years, particu-

larly in 1948 and 1949, in my opinion, there were times when I would see my husband so much worse that he was purely insane." To an objection to the admission of the statement ". . . he was purely insane," the court stated, "She can give the facts she bases her opinion on. I think the objection is good at this time."

"When facts sufficient to authorize the introduction of opinion evidence of a nonexpert witness as to the mental condition are shown, such opinion evidence may be introduced." *Brock* v. *State*, 206 *Ga.* 397, 400 (57 S. E. 2d 279).

It is the province of the judge to determine the admissibility of evidence, and, accordingly, it is his province to determine in the first instance whether or not sufficient facts have been shown to authorize the introduction of such opinion evidence. See *Potts* v. *House*, 6 *Ga.* 324 (4) (50 Am. Dec. 329); *Brock* v. *State*, 206 *Ga.* 397 (1), supra, and cases cited. A careful reading of the testimony given by the witness prior to stating her opinion that at times in 1948 and 1949 he was purely insane shows that the judge was authorized to conclude that sufficient facts of mental incapacity had not been shown to justify the opinion of the witness. See *Brumbelow* v. *Hopkins*, 197 *Ga.* 247 (29 S. E. 2d 42). There was no error in this ruling.

■ After a careful review of the evidence in this case, we are of the opinion that a verdict in favor of the propounder and the will was demanded and that the court properly directed such a verdict. See Code § 110-104.

Briefly, the record discloses that the testator, Dr. James J. Martin, a physician who retired in 1948, died on August 30, 1958, at the age of sixty-eight in the Patterson Hospital in Cuthbert, Georgia, of acute coronary thrombosis. He served in World War I and in 1927 filed a claim with the Veterans' Administration for disability compensation based on a condition described by him as "nerves." He was married to the caveatrix in 1932, when she was twenty-two years of age and he was forty-two. They separated in 1942 and she filed divorce proceedings, but after a few months they resumed their marital relations. They separated again in 1950, after which she did not see, visit, write, contact, or communicate in any manner with her husband. They were never divorced; and from July, 1950, he voluntarily paid

her $75 per month. He executed a will on July 24, 1950, shortly after their separation, in which he left his wife $25,000, payable $100 per month, either for her life, or until she remarried. Ernest Baldwin, Jr., was named executor and was bequeathed $2,500. After certain other special bequests, the balance of the estate was left to his brothers and sisters. This will was drafted by W. L. Ferguson, attorney. On February 27, 1958, the testator executed the will, the subject matter of this litigation, in which he bequeathed $20,000 in fee simple to his wife and $2,500 to Ernest Baldwin, Jr., who was again named executor, and, after certain special bequests, the remainder was left to his sisters and a brother, excluding one of the brothers included in his first will.

Mrs. Martin testified that her husband told her of his disability of a mental nature, which, during his service in the Army, was diagnosed as psychasthenia and psychoneurosis, for which he filed claim for compensation with the Veterans' Administration; that he thought everybody was after his money; that on many occasions he threatened suicide; that he frequently became frustrated and blamed the frustrations on her; that he objected to her going out; that in 1950, in her opinion, he was partially insane; that he was treated with electric shocks for a nervous disorder in September and October, 1948, at the University Hospital in Augusta, from which he was carried to the Edgewood Sanitorium in South Carolina, where he received electric shock treatments and remained for over a year; that she herself during that time received electric shock treatments at Edgewood Sanitorium; that she was not insane but was exhausted; that there was a decided change in his personality, public and private; that he was extremely suspicious; that he got progressively worse, particularly during the years 1948 and 1949; that, after their separation in 1950, she never saw him or communicated with him again.

Dr. Edwin W. Allen, a specialist in psychiatry and a witness for the caveatrix, testified that Dr. Martin was in his hospital from April 6 to April 22, 1956; that while there he was suffering from psychoneurosis; that a person with psychoneurosis can attest accurately his environment and is considered competent; that from his observations, examination, and treatment, he would

say that Dr. Martin was mentally competent at that time, did not have any form of insanity, was not insane on any subject, was competent to manage his affairs, was not suffering from any delusions about anything; that his obsessions were based on physical experiences and were not connected in any way with insanity; and that, if there was no change in his condition from the time he last saw him on April 22, 1956, until February 22, 1958, the date of the execution of the will, he would say that he would have been competent.

Other than the testimony of the caveatrix that her husband, in her opinion, was partially insane in 1950, some eight years prior to the execution of the will, there is no evidence whatever in the record of insanity of the testator at any time, nor is there any evidence to support the contention of the caveatrix that the testator was suffering from monomania at the time of the execution of the will.

The three subscribing witnesses to the will, Dr. J. C. Patterson and Dr. W. G. Elliott, both of the Patterson Hospital, who had treated Dr. Martin as a patient for many years, and Mrs. Ruth Patterson, a nurse at the Patterson Hospital, where he had been an in-and-out patient for several years, testified that he was mentally competent at the time of the execution of the will, and that he signed it freely and voluntarily, that they had never seen him when he was insane, having delusions or hallucinations of any kind, or when he was not mentally competent. Dr. Patterson testified that he had seen him when he thought he was suffering with psychoneurosis, but that psychoneurosis or psychasthenia would not affect his mental competency and that severe psychoneurosis would have no effect on the mind.

A number of other witnesses who had known Dr. Martin for many years, some of whom had seen him up to a few days prior to his death, all testified that he was mentally competent. The evidence demonstrates conclusively that, while Dr. Martin had suffered from psychoneurosis and from a nervous condition for many years, he was mentally competent prior to and at the time of the execution of the will, as well as thereafter, until his death.

There is no evidence in the record to support the contention of the caveatrix that Dr. Martin was suffering from monomania,

which caused him to execute the will, or any evidence to indicate that the will was executed under a mistake of fact or was executed because of any undue influence by Ernest Baldwin, Jr., upon the testator. In the will of July 24, 1950, made shortly after his separation from his wife, Dr. Martin named Ernest Baldwin, Jr., as executor and left him a bequest of $2,500. In the will at issue he again left him $2,500 and named him executor. The evidence discloses that W. L. Ferguson, an attorney in Cuthbert, drafted the first will, and that, when Dr. Martin decided to execute a new one, he sent for Mr. Ferguson and told him what changes he wanted made in the will; that those changes were made by this attorney and the will was thereafter freely and voluntarily executed by Dr. Martin. While there was evidence that Mr. Baldwin handled certain business affairs for Dr. Martin, kept books for him, and was permitted to draw checks on one bank account, the evidence also shows that he had several bank accounts and that the part of the business transacted by Mr. Baldwin constituted only a small part of Dr. Martin's business affairs. There is no evidence whatever of the exercise by Mr. Baldwin of any undue influence upon the testator in the execution of the will. The evidence demanded a verdict in favor of the propounder and the will, and the trial court properly directed the jury to find in favor of the will.

*Judgment affirmed. All the Justices concur.*