A90A0494. GEORGIA POWER COMPANY v. GEORGIA PUBLIC SERVICE COMMISSION et al.
A90A0495. AMERICAN ASSOCIATION OF RETIRED PERSONS v. GEORGIA PUBLIC SERVICE COMMISSION et al.

(396 SE2d 562)

BEASLEY, Judge.

Pursuant to OCGA § 50-13-20, we here review a decision of the superior court made under OCGA § 50-13-19 (h) and the case law construing it.

On April 2, 1987, Georgia Power Company (the Company) filed its request for a rate increase of approximately $805 million with the Public Service Commission (PSC) to recoup its share of the approximately $6.3 billion investment in Unit 1 of the Plant Vogtle nuclear generating plant. This was the largest rate request ever submitted to the commission and resulted in its longest proceedings — 42 days of hearings over five months, producing over 12,000 pages of transcripts and 502 exhibits. An increase of approximately $464 million was authorized.

The appeal revolves around the rate base. The PSC denied rate recognition of $951 million of the Company's submitted costs. The superior court affirmed, and the Company disputes $896 million of the superior court's affirmance. The significance of the disallowances is that they substantially reduce the figure on which the rate increase is computed, to the Company's detriment.

The trial court in a comprehensive, detailed order described the issues, the facts which it decided were supported by evidence, the related law, and the court's rationale with respect to each issue. It is most helpful and provides the opportunity for an intelligent review, because it gives the specific foundations for its rulings. See *Atlanta Transit System v. Harcourt*, 94 Ga. App. 503 (95 SE2d 41) (1956), regarding awards of the State Board of Workers' Compensation; the same applies to any appealable order.

The American Association of Retired Persons (AARP), one of numerous intervenors in the proceedings, appeals the affirmance of the PSC's findings based in part on alleged ex parte communications and the superior court's failure to reopen the record to allow evidence of that issue.

*Case No. A90A0495 (AARP)*

1. The initial order of the PSC was issued October 1, 1987. AARP moved for reconsideration, but it did not include any ground based on the allegedly improper ex parte communications. On the same day, another intervenor, Consumers' Utility Counsel, filed a motion which included the allegation of ex parte communications. The motion was

not adopted or joined by AARP. Both motions were denied. The PSC supplemented its original order thereafter, and appeal to the superior court ensued.

Although filing a motion for reconsideration before the agency is not a prerequisite to superior court review, "no objection to any order or decision of any agency shall be considered by the court upon petition for review unless such objection has been urged before the agency." OCGA § 50-13-19 (c).

The court correctly held that AARP's failure to raise the issue before the PSC precluded the court's consideration of it. "The authorization to the superior court set forth in [OCGA § 50-13-19 (g)] to hear evidence relating to alleged irregularities in procedure before the agency that are not shown in the record is an exception to the principle that review by the superior court shall be confined to the record but is not an exception to the principle stated in [OCGA § 50-13-19 (c)] requiring objections to agency decisions or orders to be urged in the first instance before the agency." *Georgia Real Estate Comm. v. Burnette*, 243 Ga. 516 (1) (255 SE2d 38) (1979). See *Georgia Public Svc. Comm. v. Southern Bell*, 254 Ga. 244, 247 (327 SE2d 726) (1985); *State Bd. of Equalization v. Trailer Train Co.*, 253 Ga. 449, 450 (320 SE2d 758) (1984); *North Fulton &c. Hosp. v. State Health &c. Agency*, 168 Ga. App. 801, 803 (1) (310 SE2d 764) (1983).

Since AARP failed to present the issue to the agency, it is not necessary to address the substantive arguments presented.[1]

*Case No. A90A0494 (Georgia Power Company)*

A construction budget request for Plant Vogtle was originally proposed by the Company in 1971, when power demands were increasing and the need for additional sources of energy was being addressed nationwide. During this period, planning, proposing, and construction startup were occurring for many of the nuclear plants now in existence or later cancelled. The original construction budget for Plant Vogtle was $660 million. It was to be a four-unit plant with two units optional for later expansion.

The Company served as its own construction manager[2] during the project, selecting as architect/engineer the Bechtel Corporation. Significant design responsibilities for the Nuclear Steam Supply System and the piping hanger system were assigned to Southern Com-

---

[1] Consumers' Utility Counsel, which did properly raise the issue and obtain substantive rulings, withdrew its appeal from this court.

[2] Defined in *Edwin J. Dobson, Jr., Inc. v. Rutgers State Univ.*, 384 A2d 1121, 1126 (fn. 3) (N. J. Superior Ct. 1978), aff'd 447 A2d 906 (N. J. Supreme Ct. 1982); J. Lambert & L. White, HANDBOOK OF MODERN CONSTRUCTION LAW 193-207 (1982).

pany Services, a component of the Southern Company, the parent of Georgia Power Company, and Westinghouse. The project was to follow the "design-build" or "fast track" method; i.e., no full project design existed as the project began but was being prepared contemporaneously.[3]

The cost estimate continued to escalate until 1973, when it was made even higher by the oil embargo and general economic conditions. By October 1977, the estimate was $2.7 billion and the projected start date for commercial operation of Unit 1 slipped to November 1984.

In March 1979, the Three Mile Island accident occurred, increasing regulation and oversight of such plants by the Nuclear Regulatory Commission. In October 1979, the Phase I Definitive Estimate based on site drawings and projected manhour and material costs was raised to $3.4 billion. Cost increases and schedule slips continued. By July 1985 the estimate hit $8.4 billion. Although costs rose even higher, the Company agreed in March 1986 to cap the costs in its rate request at $8.4 billion.

The Company's appeal alleges eight enumerations, five of which (1, 2, 3, 4, & 6) deal with three categories of costs disallowed by the PSC and affirmed by the court: 1) embed plate fabrication and installation and 2) batch plant operations, both of which impacted the schedule of the project (the $516 million schedule disallowance), and 3) costs attributable to the Company's imprudence in managing the productivity of its work force (the $380 million productivity disallowance).

Two enumerations (7 & 8) cite error in the court's not requiring the PSC to explain why it did not offset alleged benefits to customers resulting from the delay in completion and the decision to attempt to minimize delay at the expense of productivity.

Enumeration 5, addressed first, alleges error in the trial court's failure to hold that the admission of the expert opinion testimony of John Orr on productivity was error.

2. In July 1985, because of the overruns and schedule problems experienced at Plant Vogtle, the PSC retained the consulting firm of O'Brien-Kreitzberg & Associates (OKA) to examine the prudence of the Company's management of the project. During the two years before the rate hearings, OKA, both on site and by use of data requests from the Company, audited the project management both prospectively and retrospectively. In April 1987, OKA submitted to the PSC its written report, a draft of which had been previously submit-

---

[3] R. Cushman & D. Carpenter, PROVING & PRICING CONSTRUCTION CLAIMS 274-275 (1990).

ted to the Company for its use and comment.

The report contained the credentials of the members of the panel of experts including John Orr, its principal author. The panel testified before the PSC beginning May 26, 1987. Mr. Orr was extensively cross-examined by the Company as to his qualifications to express an opinion on productivity during construction of a nuclear facility. No formal objection to his testifying as an expert was made by the Company before, during or immediately after his testimony.

At the close of the OKA panel's testimony, PSC counsel moved for the introduction into evidence of the five volumes of the OKA written report. The Company asked for and was granted time to file written objections *to the introduction of these exhibits.* On June 2, 1987, the Company filed its "Brief In Opposition To Admitting Certain Portions of Hearing Exhibits . . . 87 through 91." It contended that "OKA is not competent to render opinion testimony on the subject of Vogtle productivity in view of its total lack of experience in evaluating productivity on nuclear power plants," and objected for the first time to the testimony of the witnesses before the PSC.

Since January 1, 1976, the Administrative Procedure Act has been applicable to proceedings of the PSC. Ga. L. 1975, p. 404; OCGA § 50-13-2 (1); *Georgia Public Svc. Comm. v. Southern Bell,* 254 Ga. 244, 245, supra. The rules of evidence applicable in civil non-jury trials generally apply. OCGA § 50-13-15 (1). OCGA § 46-2-51, governing the PSC only, provides that "the commission shall not be bound by the strict technical rules of . . . evidence but may exercise such discretion as will facilitate its efforts to ascertain the facts bearing upon the right and justice of the matters before it." This section dovetails with and complements OCGA § 50-13-15 (1), since § 46-2-51 comports with the standards regarding non-jury civil trials. See *Foster v. Continental Cas. Co.,* 141 Ga. App. 415, 418 (6) (233 SE2d 492) (1977).

The qualification of a witness to testify as an expert is determined by the court in judicial proceedings or by the agency in administrative settings. OCGA § 24-9-67. "[OCGA § 24-9-67] provides that the opinion of an expert witness is admissible when based upon the proven facts of the case, and our courts have uniformly held that for the testimony of an expert witness to be received, his qualification as such must be first proved. [Cits.] If that prerequisite is not met the opinion of the expert must be excluded." *Knudsen v. Duffee-Freeman, Inc.,* 95 Ga. App. 872, 879 (2) (99 SE2d 370) (1957); *Martin v. Baldwin,* 215 Ga. 293, 302 (5) (110 SE2d 344) (1959).

" ' "In this state it is necessary to object to evidence at the time it is actually offered, and failure to do so amounts to a waiver of any objection which [the party] might have had. [Cits.]" *Smith v. State,* 116 Ga. App. 45 (2) (156 SE2d 380) (1967).' *Campbell v. Wilson,* 143 Ga. App. 656 (239 SE2d 546)." *Hall County Memorial Park v. Baker,*

145 Ga. App. 296, 298 (4) (243 SE2d 689) (1978). See also *Nelms v. Dorsey*, 168 Ga. App. 452, 454 (2) (309 SE2d 426) (1983). Making reviewability even more remote is the Company's total failure to object either to the qualifications of the witness before or during the testimony of that witness and its failure to object until long after the fact.

The superior court recognized that determining relevancy and competency of evidence is within the PSC's authority and that the court had no power to disturb such a decision on review absent manifest abuse of discretion. Having not made any objection to the OKA report and testimony until after they became part of the body of evidence, the Company shows no abuse of discretion. *Georgia Public Svc. Comm.*, supra at 247; *Concrete Constr. Co. v. City of Atlanta*, 176 Ga. App. 873, 878 (5b) (339 SE2d 266) (1985); cf. *Foster v. Continental Cas. Co.*, 141 Ga. App. 415, 416 (1) (233 SE2d 492) (1977). Besides, the objection to the credentials of Orr was not meritorious. *APAC-Ga. v. Padgett*, 193 Ga. App. 706, 710 (2) (388 SE2d 900) (1989); *Hardin v. Hunter*, 174 Ga. App. 756 (1) (331 SE2d 83) (1985); *Dimambro Northend Assoc. v. Williams*, 169 Ga. App. 219, 220 (1) (312 SE2d 386) (1983); *Inta-Roto, Inc. v. Guest*, 160 Ga. App. 75, 76 (1) (286 SE2d 61) (1981).

The legal sufficiency of the OKA report and testimony is addressed hereafter.

## *Rate-Making*

3. In order to address the errors alleged concerning the three categories of excluded costs, it is necessary to recap the substantive and procedural aspects of public utility rate-making.

Rate-making is a highly technical task, heavily dependent on experts. It lies in the legislative domain. *Ga. Public Svc. Comm v. Southern Bell*, 254 Ga. 244, 245, supra; *Ga. Power Co. v. Allied Chem. Corp.*, 233 Ga. 558, 559 (212 SE2d 628) (1975). The task was delegated by the legislature to a statutory commission of five elected persons. OCGA § 46-2-1. "The Georgia Public Service Commission was created for a special purpose with special competence to deal with special matters including the establishment of rates for public utilities." *Ga. Public Svc. Comm. v. Gen. Telephone Co. of Southeast*, 227 Ga. 727-728 (182 SE2d 793) (1971). See *Lasseter v. Ga. Public Svc. Comm.*, 253 Ga. 227, 230 (2) (319 SE2d 824) (1984). "The commission shall have exclusive power to determine what are just and reasonable rates and charges to be made by any . . . corporation subject to its jurisdiction." OCGA § 46-2-23.

"The rate making process for a regulated utility, so as to produce just and reasonable rates for the utility, just and reasonable rates for present customers of the utility, just and reasonable rates for future

customers of the utility, and rates that are just and reasonable in the entire public interest, is not an exact science. Yet, after a rate hearing, the commission is called upon to come forth with just such 'just and reasonable' rates. The basic question involved is this: how much in total revenue should a public utility be authorized to collect through the rates charged for its sales of service? It is a general proposition that the total revenue requirement of a regulated utility is the sum total of its proper operating expenses, depreciation expense, taxes, and a reasonable return on the net valuation of its property that is used in the public service. The first three components of this sum total, while often causing problems in the rate making process, do not even come close to causing the problem created by the fourth component, a reasonable return on the net valuation of the utility's property used and useful in the public interest." *Georgia Power Co. v. Ga. Public Svc. Comm.*, 231 Ga. 339, 341 (201 SE2d 423) (1973). (Indention omitted.)

Determining the "reasonableness of return" requires weighing the relative merits of putting the burden of certain expenses on the ratepayers or the investors of the public utility. *Federal Power Comm. v. Hope Nat. Gas*, 320 U. S. 591, 603 (6) (64 SC 281, 88 LE 333) (1944); *Camden Tel. &c. Co. v. City of St. Marys*, 247 Ga. 687, 688 (1) (279 SE2d 200) (1981). "The very nature of regulatory activity requires treatment of specific ills in a specific industry to insure viable operation for the general good." *Lasseter v. Ga. Public Svc. Comm.*, 253 Ga. 227, 230 (2), supra.

Of fundamental significance is that prescribing rates for future application is an exercise of quasi-legislative functions by an administrative body. *Greyhound Lines v. Ga. Public Svc. Comm.*, 236 Ga. 76, 79 (222 SE2d 347) (1976); *Georgia Power v. Allied Chem.*, 233 Ga. 558 (1) (212 SE2d 628) (1975); *Mutual Light & Water v. City of Brunswick*, 158 Ga. 677, 680 (124 SE 178) (1924); *Southern Bell Tel. &c. Co. v. Invencheck, Inc.*, 130 Ga. App. 798, 799 (204 SE2d 457) (1974); see *Duquesne Light Co. v. Barasch*, 488 U. S. ___ (109 SC 609, 102 LE2d 646) (1989).

"[N]either law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders." *Permian Basin Area Rate Cases*, 390 U. S. 747, 790 (88 SC 1344, 20 LE2d 312) (1968).

### Prudency Standard

4. Because of the complexity of the case, the PSC divided its proceedings into two categories: (1) consideration of the standard chosen by the PSC for evaluation of Plant Vogtle "prudency" of the investment in Plant Vogtle Unit I, i.e., how much of the actual incurred

costs would be considered in the rate base, and (2) separate hearings to determine remaining rate-making aspects.

The prudency standard originated in Justice Brandeis' special concurrence in *Missouri ex rel. Southwestern Bell Tel &c. Co. v. Public Svc. Comm.*, 262 U. S. 276, 291 (n. 1) (43 SC 544, 67 LE 981) (1923): "The term 'prudent investment' is not used in a critical sense. There should not be excluded from the finding of the base, investments which, under ordinary circumstances, would be deemed reasonable. The term is applied for the purpose of excluding what might be found to be dishonest or obviously wasteful or imprudent expenditures. Every investment may be assumed to have been made in the exercise of reasonable judgment, unless the contrary is shown." See also *Southern Bell Tel. &c. Co. v. Ga. Public Svc. Comm.*, 203 Ga. 832, 878 (7) (49 SE2d 38) (1948).

That standard was used by the PSC, as demonstrated in its final order, which first noted that only costs "prudently incurred, reasonable and not unlawful" were qualified for rate recognition. Costs incurred as a result of "imprudent action or inaction or [which] are unreasonable, excessive or unlawful are disqualified. . . ." The prudency standard was further defined by the PSC: "The standard by which management action is to be judged is that of reasonableness under the circumstances, given what was known or should have been known at the time the decision was made or the action was taken. The concept of prudence implies a standard or duty of care owed to others. In building a nuclear power plant, the Nuclear Regulatory Commission requires the utility to exercise a high standard of care in order to protect the public health and safety. Similarly, given the costs involved and the rate impact of those costs on monopoly customers, this commission finds that the utility should be held to a high standard of care in making decisions and taking actions in its planning and constructing such a project. Thus, while the standard to be applied is reasonableness under the circumstances, where the risk of harm to the public and ratepayer is greater, the standard of care expected from the reasonable person is higher. Given this standard . . ., a reasonable person is one who is qualified by education, training and experience to make the decision or take the action, using information available and applying logical reasoning processes." (Indention omitted.)

The PSC also noted that excessive or unreasonable costs could result from a decision that was prudent when made, but that "[t]he determinative issue is not whether the decision to incur the costs was prudent, but *who should bear such costs*.[4] Such an expenditure repre-

---

[4] "Prudence on the part of a utility in incurring certain expenses is no guarantee that it

sents an additional expense to the project which is certainly more in the control of utility management than the ratepayers. Therefore, it is only appropriate that such excessive or unreasonable costs become the responsibility of the utility and not the ratepayer."

The Company argues that a previous decision of the PSC applied a different prudency standard, one referring to a "zone of reasonableness," which it contends should apply here. A copy of that PSC decision, which did not involve rate making, is appended to the brief of the Company but is not contained in the record. "We cannot consider facts, related by briefs, which do not appear in the record sent up from the clerk of the lower court." *Garrison v. Dept. of Human Resources*, 184 Ga. App. 449 (1) (361 SE2d 860) (1987). Although it was referenced in oral testimony before the PSC, that is not sufficient. The record reference made by the Company to the location of the decision is not contained in the record here. Another impediment is that such a decision, even if properly proven, would not be res judicata for the standard to be applied. See *State ex rel. Util. Comm. v. Thornburg*, 385 SE2d 451, 454 (1) (N.C. Supreme Ct. 1989).

The Company does not contend that prudency was an improper or illegal standard, but rather that it was not properly defined and applied to the evidence before the PSC. Nor is it contending that the resulting rate was confiscatory and therefore violative of OCGA § 50-13-19 (h) (1). *Duquesne*, 57 USLW at 4085; *Savannah Elec. &c. Co. v. Ga. Public Svc. Comm.*, 239 Ga. 156, 157 (236 SE2d 87) (1977).

There was no legal error in the PSC's conception of the prudency standard used.

### Scope of Review

5. The Company urged before the superior court that the actions of the PSC violated OCGA § 50-13-19 (h) (5) & (6), which provide: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. . . . The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: . . . (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

The superior court ruled that its standard of review for claims

---

will recover those expenses dollar for dollar from its customers." *Duquesne Light Co. v. Penn. Public Utility Comm.*, 507 A2d 1274, 1278 (Pa. Commonwealth Court 1986). Making the company "whole" is not the standard for rate-making. *Re Southern Bell Tel. &c. Co.*, 13 PUR4th 207, 208 (Ga. Public Service Comm. 1976).

made under subsection (5) was the "any evidence" test, which is correct. "This language 'prevents a de novo determination of evidentiary questions leaving only a determination whether the facts found by the board are supported by "any evidence." ' *Hall v. Ault*, 240 Ga. 585, 586 (242 SE2d 101) (1978)." *Georgia State Indemnification Comm. v. Lyons*, 256 Ga. 311, 312 (348 SE2d 642) (1986); *Lasseter*, supra at 232; *Bulloch Academy v. Cornett*, 184 Ga. App. 42 (360 SE2d 615) (1987). The presence of conflicting evidence, including dueling experts, is sufficient to satisfy the any evidence standard. *Georgia Real Estate Comm. v. Syfan*, 192 Ga. App. 3, 4 (1) (383 SE2d 605) (1989).

As to those grounds urged under subsection (6), the superior court defined arbitrary and capricious decisions as those having no rational basis, relying on *Tackitt v. Prudential Ins. Co.*, 758 F2d 1572, 1575 (6) (11th Cir. 1985). That is appropriate. *Greyhound Lines v. Ga. Public Svc. Comm.*, 236 Ga. 76, 77, supra. The opinions of competent experts may constitute such a rational basis. *Turnbull, Inc. v. United States*, 389 F2d 1007, 1014 (4 & 5) (Ct. Cl. 1967). Whether the PSC abused its discretion in making the decision that there was such a rational basis is a question of law. *Carnes v. Charlock Investments*, 258 Ga. 771, 772 (fn. 1) (373 SE2d 742) (1988).

The Company contends that the superior court erred in ruling that "the scope of review for rate cases is such that only the overall effect of the award is reviewed, not the methods through which the commission determined the award. *Savannah Electric &c. Co. v. Georgia Public Service Comm.*, 239 Ga. 156 (1977)." The Company argues unconvincingly that the applicability of the APA to the PSC has obliterated this rule. As stated by the United States Supreme Court, "we reaffirm these teachings of *Hope Natural Gas* [supra]: '(I)t is not theory, but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.' Id., at 602. This language, of course, does not dispense with all of the constitutional difficulties when a utility raises a claim that the rate which it is permitted to charge is so low as to be confiscatory: whether a particular rate is 'unjust' or 'unreasonable' will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return. At the margins, these questions have constitutional overtones." *Duquesne*, 102 LE2d at 658; see *Calfarm Ins. Co. v. Deukmejian*, 771 P2d 1247, 1252 (Calif. Supreme Ct. 1989).

True, the advent of the APA has changed the context of the superior court's review, but not in the way urged by the Company. The primary change is that court review is not de novo. The court must

accept the factual findings of the PSC if there is any evidence to support them. If arbitrary and capricious action is alleged the court must determine whether a rational basis exists for the decision made. As said, it is a question of law. *Georgia Public Svc. Comm.*, 254 Ga. at 246; *Carnes*, supra.

Likewise, as this court then reviews the actions of the PSC, the evidence is again construed in favor of the decision rendered, as it is when it is reviewed by the superior court. *American Motorist Ins. Co. v. Ward*, 151 Ga. App. 402 (260 SE2d 372) (1979); *Home Indem. Co. v. Swindle*, 146 Ga. App. 520 (1) (246 SE2d 507) (1978).

In evaluating the evidence presented to and considered in turn by the PSC, the superior court and this court, the governing procedural philosophy of the rate-making hearing must also be kept in mind. "At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the utility. . . ." OCGA § 46-2-25 (b).

### Schedule & Productivity Disallowances

6. The Company contends that the evidence was legally insufficient to support the disallowance of costs attributed to the schedule delay, that is, the embed and batch plant problems, and the productivity disallowance. Evaluation of delay by the superior court and this court is premised on the "critical path" being the auxiliary building as concluded by OKA, rather than the control building as contended by the Company. "Critical path" is that part of the construction which, if delayed, impacts the remainder of the construction, or that without which it cannot proceed. See Wickmire & Smith, The Use of Critical Path Method Techniques In Contract Claims, 7 Pub. Cont. L. J. 1, 43-45 (1974). OKA's location of the critical path is supported by evidence, including contemporaneous job documents and the fact that the Company's version of its critical path, not involving the auxiliary building, evolved after its receipt of the OKA draft report in November 1986.

### Embed Problems

Embeds are flat metal plates to which are attached anchor rods and nuts which extend perpendicularly from the plates and are embedded into concrete as it is poured into the structure. They serve as support bases for piping and other mechanical structures that are part of the plant.

In October 1978, the Company's Quality Assurance inspectors became aware of problems with the embeds. The fabrication specifications required that there be full thread engagement on the rods with

the nuts. Because some of the rods did not meet these specifications and had "V" shaped ends, full engagement was not obtainable. Some rods had been installed without washers and with improper tack welding or with improperly sized nuts.

All of this prompted a stop work order on the embed placement and on the concrete placement which was contingent on the embeds. The order was effective from November 21, 1978, until March 1979. Additional delay problems were caused by the lack of Quality Control Inspectors in April and May, and then problems with the concrete batch plant began.

### Batch Plant

Because of the massive amounts of concrete required on a project of this size, the Company purchased a concrete batch plant in 1974 to install on site. The plant was stored for 2-½ years at the Company's Plant Hatch. The one-year manufacturer's warranty had expired by the time it was needed.

When the batch plant was installed and began production, there were numerous problems causing delays. Included were computer problems with the scales, lack of certified inspectors, and inadequate ice plant capacity. Ice was required because the concrete had to be mixed with it instead of water to achieve the necessary temperature. This all began in May 1979, and the problems were repeatedly referred to in contemporaneous project records from July 1979 until the purchase of a second batch plant in September 1980. Other documentation also referred to the problems. Because the critical path was dependent on placement of concrete, this severely impacted the schedule and delayed the project.

Thus there was evidence to support the finding of imprudence in the management of the embed and batch plant problems and the resultant schedule disallowance.

The Company contends the superior court abused its discretion in not finding that OKA's failure to specify actions which it should have taken to correct these two areas amounted to a failure of evidence to support the schedule disallowance and violated OCGA § 50-13-19 (h) (5). The superior court rejected this argument because "[p]rudency is reasonableness under the circumstances and [is] not whether a decision was the best alternative." It also rejected the Company's urging that the prudency standard and the professional negligence standard were analogous, ruling instead that the application of the prudency standard to the actions and costs incurred was in the best interest of the ratepayers.

## Productivity Disallowance

Productivity on a construction project is the number of labor manhours required to install one unit of work. The lower the required number of hours, the more efficient the work force is and the lower the cost for installing each unit. See *U. S. Indus. v. Blake Constr. Co.*, 671 F2d 539, 546 (6) (D. C. Cir. 1982); *Luria Bros. & Co. v. United States*, 369 F2d 701, 711-713 (15, 16, & 17) (Ct. Cl. 1966).

Production is the number of units installed in a given time, regardless of the manhours required to do it. It is less efficient and more costly, but it can make up time on a schedule. R. Cushman & D. Carpenter, PROVING & PRICING CONSTRUCTION CLAIMS 174-178 (1990). The more people working on a given task, the quicker it normally gets done, even if each person does not work as efficiently as when that person is working with fewer people.

The Company acknowledges that it emphasized production at the expense of productivity and that it did not meet the productivity rates which it set internally. However, it adds, this was not unreasonable or imprudent, because the rates which it achieved were comparable to or better than rates achieved on other nuclear plants. The Company also contends that the use of its own schedules and productivity rates as a standard against which to measure the prudency of its actions was arbitrary and capricious.

The use of industry rates as a starting point for analysis is appropriate and was done by OKA in its study. Yet such rates are not exclusive. The Company has cited no convincing authority for the proposition that using the owner's or contractor's estimated rates and schedules instead is arbitrary and capricious.

There is general agreement that the factual circumstances presented in construction cases are so varied that each case must be determined on its particulars. *Natkin & Co. v. George A. Fuller Co.*, 347 FSupp. 17, 24 (2) (W. D. Mo. 1972). Thus, the conditions, rates and schedules on another nuclear project, while helpful in analysis, are not dispositive. The use of the rates and schedules prepared by the Company was not error. See *Edwin J. Dobson, Jr., Inc. v. Rutgers, St. Univ.*, 384 A2d 1121, 1135-1137 (3) (Superior Court of N. J. 1978), aff'd sub nom. *Broadway Maintenance Corp. v. Rutgers, St. Univ.*, 447 A2d 906 (Supreme Court of N. J. 1982).

The arguments made by the Company against the use of its own rates and schedules are premised upon its view of the evidence and are primarily reargument that its version of the evidence should have been accepted. Its discussion of the other concurrent causes of delay, such as the increased regulatory oversight and weather delays, even if accepted by the PSC or the superior court, would not have automatically entitled the Company to full rate compensation for the delay

and costs associated with it, as long as the Company's mismanagement was a substantial factor in the delay. See *Havens Steel Co. v. Randolph Engineering Co.*, 613 FSupp. 514, 532 (11) (W. D. Mo. 1985), aff'd 813 F2d 186 (8th Cir. 1987).

The purpose and nature of rate making, as set out in Division 3, is not to resolve fault or damages in the same sense that these issues are determined and litigated in contract and negligence disputes between owners, contractors, subcontractors and suppliers. Instead, it is to set a fair and reasonable rate for both the ratepayer and the utility. The concept of damages caused by one of the parties to the construction project is not the issue in a rate-making case. The public is not one of those parties and had nothing within its control during the process. As noted by the PSC during the hearings, if the subcontractor fabricating the embeds or the supplier of the batch plant was contractually or negligently responsible for the delays, the Company has remedies against those parties and that loss need not be visited upon the rate payers. See, e.g., *Nebraska Public Power Dist. v. Austin Power*, 773 F2d 960 (8th Cir. 1985). In fact, the Company has claimed approximately $10,000,000 against Bechtel Corporation, although the record does not reflect the outcome.

The schedule and productivity disallowances are supported by evidence and were judged against standards which were not arbitrary and capricious.

## Offsetting Benefits

7. The Company also contends in enumerations 7 & 8 that the superior court erred in not requiring the PSC to explain why it had not offset alleged benefits to customers as a result of the schedule disallowance and the minimization of the schedule delays at the expense of productivity, and that such failure of the PSC to explain its analysis of this theory was an abuse of discretion under OCGA § 50-13-19 (h) (6).

Even if the theory of offsetting benefits might have a place in the context of rate making, the Company's position that the failure of the PSC order to refer to the theory mandated reversal by the superior court fails. In workers' compensation cases under Title 34, the view is that while "[t]here is authority for remanding a case to the board based upon uncertainty that all the evidence had been considered. [Cits.] . . ., the mere failure to refer to all the evidence in the findings of fact does not establish that the board did not consider the evidence in its review of the matter. [Cits.]" *Henderson v. Mrs. Smith's &c. Foods*, 182 Ga. App. 829 (2) (357 SE2d 271) (1987). *Roberson v. Englehard Corp.*, 190 Ga. App. 674, 675 (379 SE2d 524) (1989), held that a remand by the superior court on that ground can itself be error.

The same holds true under OCGA § 50-13-19 (h).

Nothing in OCGA § 50-13-17 or in OCGA § 46-2-25, the latter of which sets out the procedure for changing rates, requires the PSC to affirmatively list all of the evidence or arguments it considered so as to show that it has considered everything. It must be assumed that it fulfilled its duty to consider what was presented to it. Moreover, in its 138-page order, the PSC reviews the entire proceedings in detail and states: "During the 'Prudency Phase' of the case, including the Company's direct case, the Staff and Intervenors' direct case and the Company's rebuttal case, this Commission heard from nine individual witnesses and thirteen panels of witnesses, with each panel consisting of two to six witnesses."

The Company unsuccessfully argued twice before the PSC that the productivity disallowance and the scheduling disallowance were "mutually exclusive." The second time was on its motion for reconsideration. Its theory is that it could not be penalized for both disallowances since one was the result of and aimed at curing the problems created by the other. The PSC rejected this argument, as did the superior court. The superior court recognized that "[t]he two disallowances would be mutually exclusive only if the initial 14.6 months delay in construction were 'made up' by the increase in manpower which led to the productivity imprudence." There was evidence to support the PSC's and the superior court's conclusion that this did not occur, eliminating any discretion violation as contemplated by OCGA § 50-13-19 (h) (6). See R. Cushman & D. Carpenter, PROVING & PRICING CONSTRUCTION CLAIMS 176-177 (1990). Nor does OCGA § 50-13-17 or OCGA § 46-2-25 require that the PSC explain why it rejects as unpersuasive certain evidence or arguments. It is judge of the facts, credibility, and weight, and no explanation is called for because these matters are not reviewable. See *Lasseter*, supra at 232.

Nor does the law require the PSC to explain its rejection of particular theories put forth by any party as to the method used in arriving at the rate decision. If for no other reason, it is because the methods are not judicially reviewable. *Savannah Elec. &c. Co.*, supra at 160: "rate making is a legislative function involving the making of policy. It is the *result* of a rate order, not the method used to arrive at it, which governs." (Emphasis in original.)

The Company claims that it was entitled by law to offsets. It contends first that it conclusively proved offsetting benefits, in a quantifiable way, through its financial analyst and certain other testimony, and second that the PSC is legally required to add such benefits into its calculation of the rate base.

The argument fails. The Company's evidence of "benefits" was simply not adequate to convince the PSC. The PSC heard all this evidence and plainly rejected the notion that the Company in fact

established that there were benefits to the ratepayers which should lessen the disallowances. Whether what the Company regarded as ratepayer "benefits" were in fact savings relevant against imprudency disallowances is problematic, based on a series of assumptions, and speculative.

The only authority presented by the Company in support of its offsetting benefits theory before the superior court and the PSC was *Macon-Bibb County &c. Auth. v. Tuttle/White Constructors*, 530 FSupp. 1048, 1055 (7, 8, & 9) (M. D. Ga. 1981). That was a suit between the Authority and its contractor and subcontractor due to problems involving installation of sludge incinerators. The problems culminated in the cancellation of the Tuttle/White bid and the award of the contract to a different company at a savings to the Authority. The Authority asserted breach of contract and other claims, and the court applied an offsetting benefits rule. There is no authority requiring the application of such a rule in rate making by the PSC.

Legislatively decided rate applications are a different species from judicially decided contract or negligence damages claims. Rate making is basically a matter of policy undertaken by the PSC as a legislative act. *Georgia Power Co. v. Allied Chem. Corp.*, 233 Ga. at 565, supra; *Allied Chem. Corp. v. Ga. Power Co.*, 236 Ga. 548, 552 (224 SE2d 396) (1976). The legal entitlement which a party may claim in the setting of damages in the latter is only a matter of option when policy is being decided by the rate maker. See *Duquesne Light Co.*, supra, where even a methodology requiring the utility to bear all the costs of a prudent investment was legally authorized.

### *Summary*

The Company, a public servant and a monopoly, sought permission to increase charges to its customers for electricity because of the costs of building a nuclear generating plant. The public agency empowered to govern such charges agreed that an increase was justified but disallowed some of the costs in calculating the rate base for a fair increase. The reason it did so was because it concluded that some of the costs were the result of the Company's imprudent management of the project in that some were attributable to avoidable delay and some were caused by poor productivity of the construction work force for whom the utility was ultimately responsible. The superior court, upon review, concluded that the agency's decision in these regards was within its bounds, and so do we.

*Judgment affirmed. Carley, C. J., McMurray, P. J., Banke, P. J., and Cooper, J., concur. Deen, P. J., Birdsong, Sognier and Pope, JJ., concur in part and dissent in part.*

DEEN, Presiding Judge, concurring in part and dissenting in part.

While concurring fully with the majority opinion's affirmance of Case No. A90A0495, I must dissent in Case No. A90A0494, as it would be error to permit a $516,000,000 schedule delay disallowance if the factfinder failed to consider the expert testimony and evidence of offsetting benefits. "[N]either law nor economics has yet devised *generally accepted standards* for the evaluation of rate-making orders." *Permian Basin Area Rate Cases*, 390 U. S. 747, 790 (88 SC 1344, 20 LE2d 312) (1968). (Emphasis supplied.) See *Macon-Bibb County &c. Auth. v. Tuttle/White Constructors*, 530 FSupp. 1048, 1055 (7, 8, & 9) (M. D. Ga. 1981), as to applicability of the offsetting benefits rule.

In reviewing the record in this case, I conclude that the PSC's findings of fact do not show that it considered relevant testimony by experts that the construction delays such as occurred in the instant case may have also resulted in rate increase delays. Any benefits to the ratepayer resulting therefrom should have entered into, and thus offset, the PSC's calculations prior to arriving at the final rate increase. This would seem to be the more acceptable, fair, and equitable standard under the facts and law of this case.

"A concise and explicit statement of the underlying facts supporting the findings" is required by the Georgia Administrative Procedures Act. OCGA § 50-13-17 (b). This requirement must be "inclusive enough to *afford an intelligent review.*" *American Century &c. Investors v. Strickland*, 138 Ga. App. 657, 660 (227 SE2d 460) (1976). (Emphasis supplied.) I do not question the arithmetical accuracy or mathematical methodology as to affirmative action taken on the issues and data that were considered; yet the findings set forth by the factfinder commission appear to be deficient as to one important point: there is a complete absence of facts reflecting consideration of testimony of experts as to offsetting benefits entering into the calculation and evaluation of the rate-making decision. We should reverse and remand for additional hearings, consideration of evidence as to offsetting benefits, and inclusion of additional underlying facts supporting the findings, which will thereafter afford an intelligent review.

I am authorized to state that Judge Birdsong, Judge Sognier, and Judge Pope join in this opinion.

DECIDED JULY 16, 1990 —
REHEARING DENIED JULY 30, 1990 — CERT. APPLIED FOR.

*Troutman, Sanders, Lockerman & Ashmore, James E. Joiner, Hugh M. Davenport, Douglas L. Miller, Kevin C. Greene, Rebecca G. McLemore,* for appellant (case no. A90A0494).

*Lipshutz, Greenblatt & King, Martin L. Ellin, James V. Zito,* for

appellant (case no. A90A0495).

*Michael J. Bowers, Attorney General, Stephanie B. Manis, Deputy Attorney General, Victoria H. Tobin, Assistant Attorney General, Hicks, Maloof & Campbell, Michael S. Bradley,* for appellees.