A97A1141. GEORGIA PUBLIC SERVICE COMMISSION
v. ALLTEL GEORGIA COMMUNICATIONS CORPORATION et al.
(489 SE2d 350)

BIRDSONG, Presiding Judge.

Georgia Public Service Commission (PSC) appeals from the superior court's final judgment reversing the decision of the PSC in Commission Docket 6731-U. OCGA § 50-13-20.

The PSC contends inter alia that the superior court's order should be reversed, as uncontradicted evidence establishes appellees ALLTEL Georgia Communications Corporation et al. (ALLTEL Companies) were overearning and, hence overcharging, approximately $24 million a year, and that these overcharges are borne by Georgia consumers. The PSC also asserts that, as its order was issued before the ALLTEL Companies became subject to alternative regulation, it had jurisdiction to remove the overearnings and order that the resulting savings be passed on to those Georgia consumers who use intrastate long distance service.

Under the Georgia Telecommunications & Competition Development Act of 1995 (TCDA) (OCGA § 46-5-160 et seq.), which became effective July 1, 1995, ALLTEL Companies are Tier 2 local exchange companies (LECs). OCGA § 46-5-162 (10). As Tier 2 incumbent LECs, ALLTEL Companies will have no viable competition for some

time, because until July 1, 1998, only currently certified Tier 2 LECs may be issued a certificate to compete for services in an area serviced by an existing Tier 2 LEC. OCGA § 46-5-163 (c).

On June 14, 1996, ALLTEL Companies filed a notice of alternative regulation with the PSC pursuant to OCGA § 46-5-165. The notice adopted July 15, 1996, as the alternative regulation effective date. On July 12, 1996, the PSC issued an order changing ALLTEL Companies' rates for intrastate switched access. ALLTEL Companies filed a petition for judicial review of the order, and the superior court subsequently entered an order reversing the administrative decision of the PSC. *Held*:

1. Appellant PSC contends the superior court erred by finding the PSC lacked jurisdiction to conduct a rule nisi of the ALLTEL Companies; appellee asserts the trial court did not make such a ruling and thus this enumeration should not be addressed. Inherent within the trial court's findings that the PSC violated the TCDA is the finding that the PSC lacked jurisdiction to conduct its rule nisi proceedings.

OCGA § 46-2-20 (a) vests the PSC with general supervisory power over telephone and telegraph companies; OCGA § 46-2-20 (c) vests the PSC with the statutory power and duty, either through promulgation of general rules or by special orders in particular cases, to require all companies under its supervision to establish and maintain such public services and facilities as may be reasonable and just. The PSC may perform any of the statutory duties imposed upon it of its own initiative. OCGA § 46-2-20 (b). Moreover, the PSC has the "exclusive power to determine what are just and reasonable rates and charges to be made by any person, firm, or corporation subject to its jurisdiction." OCGA § 46-2-23 (a). As the PSC has general jurisdiction to make a quasi-legislative determination of just and reasonable rates, see, e.g., *Ga. Power Co. v. Ga. Pub. Svc. Comm.*, 196 Ga. App. 572, 576-577 (3) (396 SE2d 562), the issue is whether under the TCDA the PSC is divested of jurisdiction to make rate determinations between the time an LEC files its alternative regulation petition and the effective date of such regulation.

OCGA § 46-5-166 (b) provides: "Rates for basic local exchange services for residential and single line business customers in effect on the date the local exchange company becomes subject to alternative regulation described in this article shall be the maximum rates that the local exchange company may charge for basic local exchange services for a period of five years, provided that such maximum rates are subject to review by the [PSC]." OCGA § 46-5-165 (b) provides: "Any Tier 2 local exchange company may elect to have the rates, terms, and conditions for its services determined pursuant to the alternative regulation described in this article upon the filing of

notice with the [PSC] and committing to provide basic local exchange services upon reasonable request." OCGA § 46-5-165 (c) provides: "The alternative regulation under this article shall become effective on the date specified by the electing company but in no event sooner than 30 days after such notice is filed with the [PSC]." OCGA § 46-5-165 (d) provides that: *"On the date* a telecommunications company *elects* the alternative regulation described in this article, all existing rates, terms, and conditions for the services *provided by the electing company* contained in the then existing tariffs and contracts are deemed just and reasonable." (Emphasis supplied.) An electing company is defined as "a local exchange company *subject to* the alternative regulation described in this article." (Emphasis supplied.) OCGA § 46-5-162 (5).

The PSC argues that OCGA § 46-5-165 (c) and (d), particularly when construed in pari materia with other relevant TCDA statutory provisions, were intended by the legislature to provide that the rates of an LEC are deemed just and reasonable on the effective date specified by the LEC in its election notice, and it is on that date the LEC becomes subject to alternative regulation. Under such a construction, ALLTEL Companies would not become subject to alternative regulation until July 15, 1996, the date "specified" in their election notice. OCGA § 46-5-165 (c). Thus it is contended that the PSC's order, issued before ALLTEL Companies became subject to alternative regulations, legitimately changed the ALLTEL Companies' rates for intrastate switched access. ALLTEL Companies, primarily relying upon the language of OCGA § 46-5-165 (b) and (d), argue that on the date they filed their notice of election of alternative regulation, the PSC lost its authority (jurisdiction) to determine ALLTEL Companies' appropriate earning levels and to adjust their rates, such rates, terms, and conditions for the service being deemed, by virtue of statute, to be reasonable and just as of the date notice of election was filed.

The superior court determined that the PSC "had violated the clear and unambiguous language of the [TCDA] by [attempting] to exercise traditional ratemaking authority after the ALLTEL Companies had already made their [alternative regulation] elections." The superior court also held: "According to the plain meaning of [OCGA § 46-5-165 (d)], on June 14, 1996 when the ALLTEL Companies elected [alternative regulation] . . . all the 'existing' rates, terms, and conditions for their services as 'contained in the then existing tariffs and contracts' were deemed 'just and reasonable.' . . . The [PSC] disregarded the statute when it purported to make a 'just and reasonable' determination. . . . In so doing, the [PSC] violated the statute and was acting in excess of its authority." We disagree.

The cardinal rule of statutory construction is to glean the intent

of the legislature. *Alford v. Pub. Svc. Comm.*, 262 Ga. 386, 387 (1) (a) (418 SE2d 13). Construction of a statute must square with common sense and reasoning, *Tuten v. City of Brunswick*, 262 Ga. 399, 404 (7) (a) (i) (418 SE2d 367). In striving to give effect to a statute's legislative purpose, courts should construe it in pari materia with other relevant statutes (*Ga. Marble Co. v. Whitlock*, 260 Ga. 350, 354 (1) (d) (392 SE2d 881)); and language in one part of a statute must be construed in the light of the legislative intent as found in the statute as a whole (*Alford*, supra). "[T]he 'golden rule' of statutory construction . . . requires us to follow the literal language of the statute 'unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else.' [Cit.] When[, as in this case,] literal reading of the statute produces such an absurdity, the appellate court must then seek to make sense out of the statute, while being faithful to the legislative intent. [Cit.] To divine the legislative intent, the court considers the purpose of the statute and its impact on the body of law as a whole. [Cit.] The court also considers the law as it existed before the statute was passed and identifies the mischief sought to be corrected. [Cit.]" *Telecom\*USA v. Collins*, 260 Ga. 362, 363-364 (1) (393 SE2d 235). Examining the TCDA, we find that in significant measure the intent of the legislature has been promulgated in OCGA § 46-5-161. OCGA § 46-5-161 (b) (2) and (5) provide for example that "It is the intent of this article to: (2) Protect the consumer during the transition to a competitive telecommunications market; [and] (5) Authorize competition for local exchange services." Consumers cannot be protected effectively during this critical transition period if the PSC is divested of its jurisdiction and power to adjust the existing rates of incumbent LECs when necessary to achieve a just and reasonable rate before the effective date of elected alternative regulation. We cannot conceive that the legislature intended to shelter an incumbent LEC whose existing rates constitute an unreasonable windfall to be borne by the consumer merely because the LEC seized the opportunity to elect alternative regulation to become effective some 30 days or more in the future. Such a sheltering of incumbent LECs could seriously undermine future competition for local exchange services and would be in direct conflict with the clear and unequivocal legislative intent to protect consumers during the transition period. Construing the TCDA in its entirety we conclude that, during the transition period occurring between the date of an incumbent LEC's election of alternative regulation and the date alternative regulation becomes effective, the PSC retains its authority to adjust the existing rates of incumbent LECs so that such rates remain reasonable and just. The superior court erred in holding that the PSC lacked authority to act after an incumbent LEC elected

alternative regulation but before alternative regulation became effective.

2. Prior to the effective date of the TCDA, the PSC and ALLTEL Companies entered into a multi-purpose regulatory plan. The principal purpose of the plan was to provide for a series of commitments by the PSC and the ALLTEL Companies which would enable the companies to invest sufficient capital to upgrade, thereby eliminating substandard telephone plants in certain exchanges and to provide improved quality service for consumers. Except for a situation not here applicable, the plan provided that no earnings proceedings or adjustments would be initiated or conducted by or on behalf of the PSC during the duration of the term of the plan, nor would ALLTEL Companies request any changes in existing local and intrastate access rates for five years or until termination of the plan, whichever occurs first. Thus, the regulatory plan in part was designed to allow the ALLTEL Companies' high rates to remain in effect for the fixed five-year time period to provide them with the capital necessary to meet their upgrade commitments. However, the plan also placed an obligation on ALLTEL Companies not to request, directly or *indirectly*, any changes in access rates while the plan was in effect. The order of the PSC approving the regulatory plan pertinently provided that "implementation of the regulatory plan preserves the [PSC's] authority and duty to insure just and reasonable rates for applicants," and that nothing in the regulatory plan "abrogates, limits, or otherwise diminishes" the constitutional and statutory powers and duties of the PSC, "including the duty to insure that the rates and charges of applicants are just and reasonable." This latter provision clearly reveals the PSC's existing intent when it entered into and accepted the regulatory plan.

Subsequently, when ALLTEL Georgia, Inc. was brought under the plan, the parties adopted a stipulation which in essence stated that the rates and charges of ALLTEL Companies were just and reasonable under the attendant circumstances. The stipulation also clarified that it was made "without any admission by or prejudice to any position which the parties might adopt during subsequent proceedings in this or related cases."

Pretermitting whether the regulatory plan in its entirety was rendered void by the ALLTEL Companies' election for alternative regulation are the questions whether the terms of the regulatory plan in fact abrogated the PSC's traditional statutory power to adjust rates to make them fair and reasonable or whether the conduct of the ALLTEL Companies in electing alternative regulation constituted a waiver of said companies' right to enforce those provisions of the regulatory plan providing for "no earnings proceedings or adjustments." We find that the regulatory plan did not abrogate or otherwise limit

the power of the PSC to adjust rates to make them fair and reasonable. The plan is, at best, ambiguous regarding this matter. Although ALLTEL Companies' intent may have differed from that of the PSC, the PSC's intent (that its power to take action to insure just and reasonable rates was not limited by the plan) clearly was revealed in its approval order and stipulation. Regulatory plan construction is consistent with general rules of contract construction. While the cardinal rule of contract construction is to ascertain the parties' intent (OCGA § 13-2-3), at times the intention of the parties may differ among themselves. "In such case, the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning." OCGA § 13-2-4. Accordingly, we conclude the true meaning of the regulatory plan was that the power of the PSC to adjust the LECs' rates to insure they remained just and reasonable was not to be limited. Assuming arguendo, the regulatory plan on its face limited the PSC's power to initiate a rule nisi, we further find that by electing alternative regulation, which would thwart the true intent of the regulatory plan to the detriment of the PSC (who had relied on the good faith continued participation of ALLTEL Companies under the terms of the plan) and the consuming public, ALLTEL Companies waived their right to contest any action taken by the PSC to insure that ALLTEL Companies' rates, which thereafter would become just and reasonable by operation of law, were in fact just and reasonable at the time of alternative regulation. See generally the following waiver by conduct cases: *Young v. John Deere Co.*, 221 Ga. App. 157, 159 (4) (471 SE2d 19); *Crotty v. Crotty*, 219 Ga. App. 408, 412 (3) (465 SE2d 517) and cases cited therein.

Contrary to the dissent's contention, nothing in the TCDA precludes an LEC from withdrawing its voluntary election for alternative regulation during the 30-day grace period and thus preserving the status quo under any existing regulatory agreement. This holds particularly true where, as in this case, the PSC exercises its authority to protect Georgia consumers by adjusting downward the excessive rate existing at the time of the election to a rate of just and reasonable amount. Moreover, the effect of the ALLTEL election if allowed to prevail would be to circumvent flagrantly the express legislative intent of the TCDA to "[p]rotect the consumer during the transition to a competitive telecommunications market." OCGA § 46-5-161 (b) (2). The 30-day grace period was statutorily created to facilitate inter alia this legislative intent. "[W]e are not prone to condone the intentional [or inadvertent but flagrant] circumvention of the clear legislative purpose of protective statutes." *Ghai v. State*, 219 Ga. App. 479, 481 (465 SE2d 498).

In view of the above holdings, we will not address appellant's

remaining contentions in support of its enumerations of error.

*Judgment reversed. Andrews, C. J., Pope, P. J., and Ruffin, J., concur. Johnson, Blackburn and Eldridge, JJ., dissent.*

ELDRIDGE, Judge, dissenting.

I respectfully dissent. Under OCGA § 46-5-165 "(b) [a]ny Tier 2 local exchange company [appellees] may *elect* to have the rates, terms, and conditions for services determined pursuant to the alternative regulation described in this article *upon the filing of notice with the commission* and committing to provide basic local exchange services upon reasonable request. (c) The alternative regulations under this article shall *become effective on the date specified by the electing company* but in no event sooner than 30 days after such *notice is filed with the commission. (d) On the date a telecommunications company elects* the alternative regulation described in this article, *all existing rates, terms, and conditions for the services provided by the electing company contained in the then existing tariffs and contracts are deemed just and reasonable."* (Emphasis supplied.)

The language is plain, clear, and unambiguous. Two separate dates are mentioned in the section: the *election date* and the *effective date*, which cannot be the same by the express language of the section. As part of this same section and consciously aware of the two dates, the General Assembly created an irrebuttable presumption that on the *date of election* "then existing tariffs and contracts are deemed just and reasonable." The electing company cannot change the maximum existing rates upward and the Public Service Commission ("PSC") cannot raise or lower the maximum rates for five years except as provided under OCGA § 46-5-166 (f). By making an election, regardless of the effective date chosen, the electing company freezes the maximum rate at the moment in time that election is made, not the effective date selected, and thus the electing company establishes the "maximum rates that the local exchange company may charge for the basic local exchange services for a period of five years." OCGA § 46-5-166 (b). The General Assembly intended this method to assure a local exchange company that, if it made an irrevocable election based upon existing conditions and went through the time and expense of changing over to a free market, then the PSC could not change the terms and conditions after such election and before the effective date, causing planning and economic uncertainty for the company by being locked into an unforeseen rate structure imposed after the election had been irrevocably made.

If the majority's and PSC's interpretation is followed, then no reasonably prudent local exchange company will risk making an election, because it may find itself locked into an inadequate return on capital for five years caused by PSC changes made between the date

of election and the effective date and based upon inadequate or erroneous data. Such would be contrary to the expressed intent of the General Assembly to encourage and not frustrate election to come under the alternative regulation. OCGA § 46-5-161. Therefore, to avoid just such action by the PSC, which the General Assembly could reasonably foresee, OCGA § 46-5-165 (d) was included to forestall the PSC from doing what it now seeks to do, change the maximum rates downward prior to the effective date and locking lower rates in for five years. Under the majority's construction, an electing company must run the gauntlet between the election date and the effective date risking a PSC-ordered reduction in maximum existing rates and becoming locked in for the next five years to such rate structure.

In the case sub judice, the PSC engaged in retroactive rate-making after appellees had elected to come under the alternative rate structure. Such retroactive rate-making even under the general provisions is prohibited. OCGA § 46-2-25 (d); *Southern Bell Tel. &c. Co. v. Ga. Pub. Svc. Comm.*, 203 Ga. 832, 883 (49 SE2d 38) (1948); *Atlanta Gas Light Co. v. Ga. Pub. Svc. Comm.*, 212 Ga. App. 575, 583 (2) (442 SE2d 860) (1994). To escape such prohibition, the majority must construe OCGA § 46-5-165 (d) contrary to its plain, clear, and unambiguous meaning and give it a tortured construction. The trial court within the standard of review under OCGA § 50-13-19 (h) (1) and (2) found that the PSC had exceeded its statutory authority in violation of OCGA §§ 46-5-165 (d) and 46-2-25 (d).

When the language of a statute is clear and unambiguous, trial and appellate courts are mandated to construe the statute as written and not to impose a different meaning to the statute. *Mullins v. First Gen. Ins. Co.*, 253 Ga. 486, 487 (322 SE2d 265) (1984); *Hollowell v. Jove*, 247 Ga. 678, 681 (279 SE2d 430) (1981); *Rayle Elec. Membership Corp. v. Cook*, 195 Ga. 734, 735 (25 SE2d 574) (1943); *Standard Oil Co. &c. v. State Rev. Comm.*, 179 Ga. 371, 377 (176 SE 1) (1934).

If the PSC's position prevails, then this Court has applied OCGA § 46-5-165 in an unconstitutional fashion in violation of both appellees' federal and state constitutional rights to be free from as a "Bill of attainder; ex post facto law," U. S. Const., Art. I, Sec. 10, Cl. 1, and Ga. Const. of 1983, Art. I, Sec. I, Par. X; as a taking for public purposes without just and adequate compensation, U. S. Const., Amends. V and XIV, Sec. 1, and Ga. Const. of 1983, Art. I, Sec. I, Par. I and Sec. II; Art. I, Sec. II, Par. V; and Art. I, Sec. III, Par. I, which was raised in the trial court but not ruled upon because the trial court by statutory construction avoided the constitutional issues. Such constitutional issues will affect all future applications of this act and lead to a constitutional attack on the application.

The PSC's interpretation adopted by the majority will allow the PSC to act in an arbitrary and capricious manner in the future by

allowing it to change rates after an election and prior to the minimum effective date to reduce rates but never to raise rates on such short a period for review. Such construction of the act will cause few local exchange companies to risk election, which will frustrate the legislative purpose to induce election and to create a voluntary free market regulation.

I am authorized to state that Judge Johnson joins in this dissent and Judge Blackburn concurs in the result only of the dissent.

DECIDED JULY 3, 1997 —
RECONSIDERATION DENIED JULY 16, 1997 — ▉▉▉▉▉▉▉▉

*Thurbert Baker, Attorney General, Brenda H. Cole, Deputy Attorney General, Alan Gantzhorn, Senior Assistant Attorney General, Thomas K. Bond, Assistant Attorney General*, for appellant.

*Chorey, Taylor & Feil, John L. Taylor, Jr., Charles V. Gerkin, Jr., Matthew L. Hess*, for appellees.