A97A1997. GEORGIA PUBLIC SERVICE COMMISSION v. ALLTEL GEORGIA COMMUNICATIONS CORPORATION et al.

(497 SE2d 50)

ANDREWS, Chief Judge.

Alltel Georgia Communications Corporation and other Alltel telecommunications companies (Alltel companies) filed a petition in the Fulton County Superior Court pursuant to OCGA § 50-13-19 seeking review of the Georgia Public Service Commission's (PSC) decision interpreting OCGA § 46-5-166 (f) (2), a section of the Telecommunications & Competition Development Act of 1995 (OCGA § 46-5-160 et seq.).[1] The Superior Court found that the PSC had interpreted the statute contrary to its plain meaning and reversed the decision. On appeal, the PSC contends the Superior Court erred in its interpretations of the statute and failed to give proper deference to the PSC interpretation. For the following reasons, we find that the PSC interpretation of OCGA § 46-5-166 (f) (2) failed to give effect to the plain meaning of the statute and was properly reversed by the Superior Court.

The PSC has general regulatory power over telecommunications companies operating in Georgia and has traditionally exercised that power to require the maintenance of certain designated levels of public services and to determine reasonable rates and charges for such services. OCGA §§ 46-2-20 (a), (c); 46-2-23 (a); *Ga. Pub. Svc. Comm. v. Alltel Ga. Communications Corp.*, 227 Ga. App. 382, 383 (489 SE2d 350) (1997). The Telecommunications & Competition Development Act of 1995 (TCDA) was enacted by the Legislature "to establish a new regulatory model for telecommunications services in Georgia to reflect the transition to a reliance on market based competition. . . ." OCGA § 46-5-161 (a) (1). To help accomplish this, the TCDA allows telecommunications companies providing basic local exchange services to elect an alternative form of regulation "pursuant to which the rates, terms, and conditions for telecommunications services provided by a local exchange company are set pursuant to the rules specified in [the TCDA]." OCGA §§ 46-5-162 (1); 46-5-161

---

[1] Alltel Georgia Communications Corp.; Georgia Alltel Communications Co.; Alltel Georgia, Inc.; Georgia Alltel Telecom, Inc.; and Georgia AlltelCom Co. sought review of the final decision of the PSC in Docket No. 5825-U, styled In Re: Universal Services Access Fund.

(b) (1). Under the TCDA, the Alltel companies at issue were classified as Tier 2 local exchange companies (LECs). OCGA § 46-5-162 (10). As Tier 2 LECs, the Alltel companies elected pursuant to OCGA § 46-5-165 (b) to have their rates, terms and conditions for services determined pursuant to the alternative regulation described in OCGA § 46-5-166. See *Alltel Ga. Communications Corp.*, supra at 383.

As part of the alternative regulation described in OCGA § 46-5-166, the statute provides a method by which the higher rates charged by Tier 2 LECs for intrastate switched access are phased down to parity with the interstate switched access rates charged by Tier 2 LECs. At the same time, the statute also provides a method by which Tier 2 LECs will be compensated for revenue lost through the reduction of the intrastate switched access rates by either an increase in the rates charged by the LECs for basic local exchange services or by payments to the LECs from universal service funds. A Universal Access Fund from which such payments may be made was established in OCGA § 46-5-167. Under OCGA § 46-5-166, the PSC has authority to govern this transition to lower intrastate switched access charges.

The transition is set forth in subsection (f) (2) of OCGA § 46-5-166 which provides in relevant part as follows: "Each Tier 2 local exchange company shall, prior to July 1, 2000, adjust in equal annual increments its intrastate switched access charges to parity with its similar interstate access rate. The [PSC] shall have authority to govern the transition of Tier 2 local exchange company switched access rates to their corresponding interstate levels and shall allow adjustment of other rates, including those of basic local exchange services or universal service funds, as may be necessary to recover those revenues lost through the concurrent reduction of the intrastate switched access rates. In no event shall such adjustments exceed the revenues associated with intrastate to interstate access parity as of July 1, 1995. In addition, if access revenues have dropped below July 1, 1995, levels in subsequent years, the adjustment in those years will be based on the reduced balance." In conjunction with these provisions, the TCDA further directs the PSC pursuant to OCGA § 46-5-167 (a) and (b) to require all telecommunications companies in Georgia to contribute to a Universal Access Fund administered by the PSC and created for the purpose of "assur[ing] the provision of reasonably priced access to basic local exchange services throughout Georgia."

After the enactment of the TCDA, the PSC initiated an administrative action on its own motion pursuant to OCGA § 46-2-20 (b) to interpret and implement the provisions of OCGA §§ 46-5-166 (f) (2) and 46-5-167. As part of this action, the PSC issued an interim order on June 20, 1996, and a final order on August 30, 1996. The PSC con-

cluded that the first annual incremental rate reduction under OCGA § 46-5-166 (f) (2) occurred on July 1, 1996. The orders also provided that an interim Universal Access Fund be established under OCGA § 46-5-167 to fund adjustments paid to Tier 2 LECs under the provision of OCGA § 46-5-166 (f) (2) for payments from universal service funds. The orders further contained the PSC interpretation as to the amount of the adjustments it was required to make in favor of a Tier 2 LEC under OCGA § 46-5-166 (f) (2) in order to allow the LEC "to recover those revenues lost through the concurrent reduction of the intrastate switched access rates."

Before addressing the PSC interpretation of the statute, we set forth the interpretation of OCGA § 46-5-166 (f) (2) which we find is consistent with the plain meaning of the statute. The statute requires that the LEC receive monetary adjustments, either in the form of payments from universal service funds or from an increase in the rate for basic local exchange services, "as may be necessary to recover those revenues lost through the concurrent reduction of the intrastate switched access rates." The total amount of rate reduction required by the statute is determined by comparing the LEC's 1995 intrastate switched access rate to the LEC's similar 1995 interstate access rate. The difference between these two rates (the 1995 rate difference) is the total rate reduction necessary to reach parity with the interstate rate prior to July 1, 2000. The statute also contains a cap on the total amount of adjustments which a Tier 2 LEC may receive under OCGA § 46-5-166 (f) (2) by providing that: "In no event shall such adjustments exceed the revenues associated with intrastate to interstate access parity as of July 1, 1995." The cap on adjustments is determined by multiplying the 1995 rate difference by the total units of intrastate switched access sold by the LEC during the year ending July 1, 1995. The product obtained by multiplying these two figures reflects the amount of revenue the LEC earned in the year prior to July 1, 1995, in excess of the amount of revenue that the LEC would have earned had the intrastate rate been at parity with the interstate rate for that year. This product represents "the revenues associated with intrastate to interstate access parity as of July 1, 1995," and is the maximum amount of adjustment to which an LEC is entitled under OCGA § 46-5-166 (f) (2). It follows that this product divided by the number of statutorily required equal annual reductions provides the maximum that the Tier 2 LEC may recover in adjustments each year. Furthermore, for the Tier 2 LEC "to recover those revenues lost through the concurrent reduction of the intrastate switched access rates," as provided by the statute, the LEC is entitled to adjustments each year equal to the product obtained by multiplying the required incremental annual rate reduction by the total units of intrastate switched access sold by the LEC

during the year at the reduced rate. Of course, no adjustment amounts may be obtained in excess of the statutory cap, and, as set forth in the statute, "if access revenues have dropped below July 1, 1995, levels in subsequent years, the adjustment in those years will be based on the reduced balance." OCGA § 46-5-166 (f) (2).

The PSC argues on appeal that the above interpretation of OCGA § 46-5-166 (f) (2) would result in Tier 2 LECs recovering adjustment amounts in excess of that intended by the statute where the LEC experiences growth in access revenues in years subsequent to the year ending July 1, 1995. Under the PSC interpretation, "revenues lost through the concurrent reduction of the intrastate switched access rates" are calculated as follows: Using the year ending July 1, 1995 as the benchmark, calculate the revenue that the LEC generated by selling intrastate switched access in that year, prior to any rate reduction, by multiplying the intrastate rate by the total units of intrastate switched access sold by the LEC. In subsequent years, multiply the reduced intrastate switched access rate by the increased total units sold by the LEC at the reduced rate. The difference is the LEC's net revenue loss taking growth in access revenue into account as an offset against the gross revenue lost by selling units of access at the reduced rate.[2] Under the PSC interpretation, any growth in access revenues in subsequent years is calculated as an implicit subsidy that reduces the revenue loss incurred under the statute when the LEC sells units of access at the reduced rate. According to the PSC, even if a Tier 2 LEC sold an increased number of intrastate switched access units at the reduced rate, the LEC would be entitled to no adjustment under the statute if the total amount of revenue generated by the subsequent sales exceeded the total amount of revenue generated by the LEC from the sale of such access in 1995 at the higher rate. The PSC position takes no account of any increased cost to the LEC associated with growth.

We find no basis for the PSC interpretation in the language of OCGA § 46-5-166 (f) (2). The statute provides that a Tier 2 LEC is entitled to adjustments, up to the statutory cap, "as may be necessary to recover those *revenues lost through the concurrent reduction of the intrastate switched access rates.*" Where a Tier 2 LEC experiences the same access sales or a growth in access sales during the phase-down of rates, the clear mandate of subsection (f) (2) is to calculate revenues lost by virtue of selling each intrastate switched access unit at the concurrently reduced rate. There is nothing in the

---

[2] The PSC subsequently entered an "amendatory order" on December 18, 1996, after the appeal to the Superior Court. Although this order presented a "simplified" method of calculating revenue lost, the PSC specifically "maintain[ed] the prior Commission interpretation of OCGA § 46-5-166 (f) (2)" and "affirm[ed] its prior decision."

statute indicating that growth in access revenue should be calculated as an offset against such revenue lost by an LEC during the phase-down to parity with interstate rates.

An interpretation rejecting an offset for growth in access revenue comports with the duty to follow the literal language of the statute. *Telecom\*USA v. Collins*, 260 Ga. 362, 363 (393 SE2d 235) (1990). It is also consistent with construing the intent of the Legislature in light of the purpose of the TCDA in the transition to lower intrastate switched access rates. *Alford v. Pub. Svc. Comm.*, 262 Ga. 386, 387 (418 SE2d 13) (1992). One intent of the TCDA is to maintain reasonable rates charged to consumers for basic local exchange services while changing the method by which Tier 2 LECs are compensated for providing these services at the regulated rates. OCGA §§ 46-5-161 (b); 46-5-166; 46-5-167. As the PSC concluded in its August 20, 1996 order, in enacting the TCDA, the Legislature recognized that the reasonable costs incurred by many Tier 2 LECs in fulfilling the duty to provide basic local exchange services (universal access), especially in less densely populated areas, may exceed the revenues generated by the allowed rates. Traditionally, such Tier 2 LECs were compensated for this loss by an implicit subsidy contained in the high access charges paid by long distance carriers to Tier 2 LECs for use of the LECs' switching facilities. Under the alternative regulation of the TCDA, these implicit subsidies are phased out and replaced by an explicit subsidy in the form of a Universal Access Fund contributed to by all telecommunications companies in Georgia. Since the implicit subsidies existing prior to phase-down of access rates contained no offset for growth in access revenue, it is reasonable to conclude that, in the absence of any clear direction to the contrary, the Legislature intended no such offset in the statute setting forth the explicit subsidy which acts as a replacement during the phase-down period.

There is no merit to the PSC's additional contention that, unless its interpretation is adopted, the Alltel companies will be entitled to a fixed subsidy in perpetuity under OCGA § 46-5-166 (f) (2). Subsection (f) (2) requires the PSC to make adjustments to Tier 2 LECs as a subsidy only for the period of the phase-down to parity with interstate rates. Additional subsidies from the Universal Access Fund sought by Tier 2 LECs electing alternative regulation may be applied for under the procedures set forth in OCGA § 46-5-167.

Under OCGA § 50-13-19 (h) (1), the Superior Court was empowered to reverse the decision of the PSC if it was in violation of a statutory provision. *Bd. of Natural Resources v. Walker County*, 200 Ga. App. 301, 308 (407 SE2d 436) (1991). In reversing the PSC decision in this case, the Superior Court did not impermissibly substitute its judgment for that of the PSC as to the weight of the evidence on

issues of fact, but ruled as a matter of law that the PSC interpretation of OCGA § 46-5-166 (f) (2) violated the statutory provisions. Accordingly, the Superior Court correctly reversed the PSC decision.

*Judgment affirmed. Johnson and Blackburn, JJ., concur.*

DECIDED FEBRUARY 12, 1998.

*Thurbert E. Baker, Attorney General, Brenda H. Cole, Alan Gantzhorn, Assistant Attorneys General,* for appellant.

*Chorey, Taylor & Feil, Charles V. Gerkin, Jr., Sutherland, Asbill & Brennan, David I. Adelman, James S. Hurt, Peyton S. Hawes, Jr.,* for appellees.

*Kennard B. Woods, John H. Maclean,* amici curiae.