A99A0129. NICHOLL v. GREAT ATLANTIC & PACIFIC TEA
COMPANY et al.
(517 SE2d 561)

ELDRIDGE, Judge.

Grant J. Nicholl, plaintiff-appellant, lost or had stolen his wallet with his driver's license, credit cards, and other identification in a nightclub in DeKalb County in August or September 1993.

On October 28, 1993, an unknown perpetrator was allowed by NationsBank of Georgia, N. A., to open a checking account in the name of Grant J. Nicholl with plaintiff's stolen identification and with only a $25 deposit. Such perpetrator passed a number of checks on such account which were returned to the payees due to "NSF" or "Account In Process of Closing." Plaintiff was unaware that his credit identity had been stolen and that someone was using a fraudulent checking account with his identity to pass bad checks.

The checks included: four checks to Ingle Foods; one check to B. Dalton Books; one check to Pizza Hut; one check to Greyhound; five checks to Kroger Company; one check to A & P; and multiple checks to Cub Foods. All these checks were returned to the payees for "NSF" and "Account In Process of Closing." On December 23, 1993, the perpetrator wrote a check made payable to A & P for $136.42, forged with the signature of Grant J. Nicholl, and furnished a false address

and telephone numbers; however, the date of birth and driver's license number were plaintiff's.

The defendant, upon return of the check marked "NSF, Account In Process of Closing," sent a certified letter to the perpetrator at 4106 Glenwood Road, Apartment Number 3, Decatur, Georgia, addressed to the stolen credit identity of "Grant J. Nicholl." The notice was returned to the defendant marked "Return to Sender; Addressee Unknown." On March 23, 1994, after return of the letter, the defendant obtained a warrant for Grant J. Nicholl which was sworn out by Douglas Anderson, its employee-store manager and co-defendant. Defendant made no investigation and took no steps to determine that Grant J. Nicholl was, in fact, the possessor of the NationsBank account and the drawer of the bad check. Other receivers of the bad checks, through reasonable investigation, determined that the plaintiff was not the drawer of checks in the name of Grant J. Nicholl drawn on the fraudulent NationsBank account.

The lack of further investigation was contrary to A & P's own practice of sending a second letter. A & P employees, when the letter comes back, go over the incident with the cashier to determine if there was anything that could assist in the identifying of the suspect; however, in this case it cannot be remembered if this was done. A & P's policy was to attempt to call the individual at home or work if the letter comes back. Although there were two telephone numbers on the check, the person responsible for contacting the check writer if the letter comes back did not know if he tried to call the numbers. The A & P store manager did not fill out the response sheet to show what he had done in this case. In short, the manager did not follow store investigative policy and practices prior to taking out the warrant.

On September 2, 1994, plaintiff was stopped for speeding. The arresting officer did a computer check for outstanding warrants and found a warrant for issuance of a bad check, which was drawn on the fraudulent checking account using plaintiff's stolen identity. Instead of releasing plaintiff for the traffic offense, the officer took plaintiff into custody on the bad check warrant.

Plaintiff pled not guilty in court. On February 14, 1995, after giving samples of his handwriting which showed that the account signature and checks were forgeries, the trial court approved the entry of a nolle prosequi to the charge of issuing a bad check.

On February 26, 1996, plaintiff sued The Great Atlantic & Pacific Tea Company ("A & P") and its employee, Douglas Anderson, for malicious prosecution. The defendants timely answered. On February 6, 1998, defendants filed their motion for summary judgment. On June 12, 1998, the trial court granted the motion. Plaintiff timely appealed.

1. The plaintiff's first enumeration of error is that the trial court erred in granting summary judgment for the defendants after finding that they acted with probable cause in swearing out a bad check warrant against the plaintiff. We agree.

Over a period of time, the unlawful taking and use of the identity and credit history of another has reached such major proportions in Georgia that in 1998, the General Assembly created a separate criminal act to protect the public, the "Financial Identity Fraud Act." Ga. L. 1998, p. 865, § 2; OCGA § 16-9-120 et seq. Clearly, plaintiff was a victim of what now is called "financial identity fraud." From 1993 through 1995, an unknown perpetrator committed (1) theft of plaintiff's identification papers, including his driver's license and social security card; (2) fraud and forgery in opening a bogus checking account; and (3) forgery in signing plaintiff's name and using his identification papers to pass bad checks. See OCGA §§ 16-8-2; 16-8-3 (a); 16-9-1 (a); 16-9-4; 16-9-20 (a).

"A criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted shall give him a cause of action." OCGA § 51-7-40.

> The elements of malicious prosecution include: (1) prosecution for a criminal offense; (2) the prosecution instigated under a valid warrant, accusation, or summons; (3) termination of the prosecution in favor of the plaintiff; (4) malice; (5) want of probable cause; and (6) damage to the plaintiff. OCGA § 51-1-40[ ]; *Sizemore Security Intl. v. Lee*, 161 Ga. App. 332 (287 SE2d 782) (1982); *Ellis v. Knowles*, 90 Ga. App. 40 (81 SE2d 884) (1954).

*Medoc Corp. v. Keel*, 166 Ga. App. 615-616 (1) (305 SE2d 134) (1983). Those essential elements that are attacked most often on summary judgment are: "(1) a prosecution instituted maliciously and (2) without probable cause which (3) has terminated favorably to the plaintiff. [Cits.]" *J. C. Penney Co. v. Miller*, 182 Ga. App. 64, 66 (2) (354 SE2d 682) (1987); see also *Atlantic Zayre v. Meeks*, 194 Ga. App. 267, 268 (1) (390 SE2d 398) (1990). However, in this case, probable cause is the essential element being attacked.

> Want of probable cause is an essential element of a malicious prosecution cause of action. Ordinarily, the existence of probable cause is a question of fact for jury determination. Only where the material facts are not in dispute, or when only one reasonable inference can be drawn from the evidence, does the existence of probable cause become an issue of law for the court to resolve. [Cits.]

*Kviten v. Nash,* 150 Ga. App. 589, 591 (4) (258 SE2d 271) (1979).

> "Want of probable cause is the gravamen of an action for malicious prosecution; and there can be no recovery by the plaintiff when there was any probable cause for the prosecution, even though it may appear that the prosecutor was actuated by improper motives. [Cits.]"

*Tanner-Brice Co. v. Barrs,* 55 Ga. App. 453, 454 (5) (190 SE 676) (1937).

> Furthermore, [t]he burden of proving the want of probable cause [at trial] is on the *plaintiff,* and he does not in any reasonable sense carry this burden unless he shows by his evidence that, under the facts as they appeared to the prosecutor *at the time of the prosecution,* the prosecutor could have had *no* reasonable grounds for believing the plaintiff to be guilty of the charge for which he was prosecuted.

(Citations and punctuation omitted; emphasis in original.) *West v. Baumgartner,* 228 Ga. 671, 676-677 (187 SE2d 665) (1972); see also *Lovinger v. Pfeffer,* 107 Ga. App. 636, 637 (1) (131 SE2d 137) (1963); *Sirmans v. Peterson,* 42 Ga. App. 707, 709 (157 SE 341) (1931).

The defendants placed themselves at risk of suit for malicious prosecution when they undertook criminal prosecution without adequate investigation to determine if there was a reasonable basis to believe probable cause existed. *Ellis v. Knowles,* supra at 42. Since probable cause was based upon the reasonable belief of the prosecutor at the time the warrant was taken out by them, then, in deciding if the belief is reasonable, the prosecutors must have determined "that [the] apparent state of facts which seems to exist *after reasonable and proper inquiry* [by the exercise of] the *duty of caution and avoidance of haste* [constituted probable cause]." (Emphasis supplied.) *Auld v. Colonial Stores,* 76 Ga. App. 329, 335 (2) (45 SE2d 827) (1947); see also *Coleman v. Allen,* 79 Ga. 637, 640-642 (5 SE 204) (1887); *Sanfrantello v. Sears, Roebuck & Co.,* 118 Ga. App. 205, 207 (163 SE2d 256) (1968). If a reasonable person would have investigated to determine if probable cause existed prior to swearing out a warrant, then such failure to make an investigation may imply malice, as well as go to whether probable cause existed. See *Medoc Corp. v. Keel,* supra at 617 (2); *Melton v. LaCalamito,* 158 Ga. App. 820, 824 (282 SE2d 393) (1981).

> In actions for malicious prosecution, the question is, not whether the plaintiff was guilty, but whether the defendant had *reasonable cause to so believe* — whether the circum-

stances were such as to create in the mind of the defendant a *reasonable belief* that there was probable cause for the prosecution. Probable cause is defined to be the existence of such facts and circumstances as would excite the *belief* in a reasonable mind, acting on the facts *within the knowledge of the prosecutor*, that the person charged was guilty of the crime for which he was prosecuted.

(Citations and punctuation omitted; emphasis in original.) *Tanner-Brice Co. v. Barrs*, supra at 453 (2); see also *Wilson v. Wheeler's, Inc.*, 190 Ga. App. 250 (378 SE2d 498) (1989).

In such actions, want of probable cause is a question for the jury and is a mixed question of law and fact. "Whether the circumstances alleged to show probable cause existed is a matter of fact, to be determined by the jury, but whether they amount to probable cause is a question of law for the court." (Citations and punctuation omitted.) *Wilson v. Wheeler's, Inc.*, supra at 252 (1).

Probable cause in this regard may be defined as the existence of such facts and circumstances in the mind of a reasonable person, the reaction of those facts and circumstances upon the mind of such reasonable person, and the reasonable acting on the facts within the mind of the prosecutor, so as to cause a belief the person was guilty of the crime for which the prosecution was being pursued.

*Booker v. Eddins,* 183 Ga. App. 449, 451 (359 SE2d 211) (1987), overruled on other grounds, *Cincinnati Ins. Co. v. Premier Tractor & Trailer Repair,* 192 Ga. App. 243 (384 SE2d 449) (1989). Probable cause may not approach absolute certainty as to the facts, and it is not inconsistent with a considerable element of doubt; however, it must be more than mere conjecture or unfounded suspicion. The belief must be supported by appearances known to the defendant at the time, and a prosecution instituted without probable cause cannot be justified by anything, short of guilt in fact, which comes to the knowledge of the defendant later. The appearances must be such as to lead a reasonable man to set the criminal proceeding in motion.

The defendant is not necessarily required to verify his information, where it appears to be reliable; but where a reasonable man would investigate further before beginning the prosecution, he may be liable for failure to do so. All such factors as the reliability of the source, the availability of further information and the difficulty of obtaining it, the reputation of the accused, and his opportunity to offer an explanation, and the apparent necessity of prompt action, are to

be considered in determining whether it was reasonable to act without verification. Prosser, [Law of Torts, § 119, 842 (4th ed. 1971)].

(Punctuation omitted.) *Melton v. LaCalamito*, supra at 824 (2) (b); see also *Atlantic Zayre v. Meeks*, supra at 269; *Wilson v. Wheeler's, Inc.*, supra at 253.

This is not a case where a pre-warrant investigation or other inquiry was conducted by the defendants or the police. *Medoc Corp. v. Keel*, supra at 617. This also is not a case where immediate action to catch the perpetrator demands action without time to investigate further. While there existed probable cause to reasonably believe that a perpetrator passed a bad check to the defendants, the identity of the perpetrator was unknown, although false identification was presented, giving a real "identity." "[T]he prosecutor is under a duty of caution and avoidance of haste. [Cits.]" *Sanfrantello v. Sears, Roebuck & Co.*, supra at 207; see also *McGonagil v. Treadwell*, 216 Ga. App. 850 (456 SE2d 260) (1995); *Jones v. Parrish*, 203 Ga. App. 566, 568-569 (417 SE2d 210) (1992).

Where there exist many people with the same name, where financial identity fraud is common, and where criminals passing bad checks conceal their true identity through various means, a reasonable person would not assume that the identity on the check was the same as the perpetrator without further investigation to verify that the perpetrator and the identity are the same person, because it is equally reasonable to believe that a criminal who would pass a bad check would also use a false I. D. or another's identification as a means to conceal his true identity. See *Kviten v. Nash*, supra at 591 (5); *Sirmans v. Peterson*, supra at 709. Thus, the identity of the perpetrator was uncertain, requiring an investigation before a warrant was sworn out against an identity which may or may not be the perpetrator. See *Melton v. LaCalamito*, supra at 824. A & P's own policy of sending a second letter if the first letter is returned indicates an awareness that there is a problem as to either identity or address. This need is further underscored by the need to attempt to call the person at home or work prior to taking out a warrant; the lack of a valid address and telephone numbers should indicate the need for further investigation.

It is to avoid misidentification that the law enforcement community verifies the identity of a suspected perpetrator prior to making an arrest. Criminals often seek to conceal their identity to avoid prosecution. To avoid making mistakes as to identity, law enforcement agencies are mandated after arrest in felony cases, and some misdemeanor cases, to provide the name used, known aliases, photographic identification records in conjunction with a physical descrip-

tion, fingerprints, date of birth, social security number, biographical history, criminal history, and possibly DNA, if available, to the Georgia Crime Information Center ("GCIC") so that a positive identification can be made of suspects in the future by their GCIC identification number maintained by the GBI and cross-checked with the National Crime Information Center ("NCIC") maintained by the FBI prior to arrest. OCGA §§ 35-3-4 (a) (1), (8); 35-3-36. To take out a warrant without knowing if the person who is named in the warrant is the perpetrator risks a finding of lack of probable cause by arresting the wrong person. See *Ellis v. Knowles*, supra at 42 (2).

In this case, the defendants took what is now known to be a forged signature with the real driver's license number and social security number and assumed, without even a preliminary investigation, that the perpetrator and the stolen identity were the same person. See *Melton v. LaCalamito*, supra at 824. The defendants did not even obtain a physical description from the cashier who accepted the bad check or NationsBank's customer service person who opened the checking account. Where, as in this case, there was no press of time or urgency, inquiry with the Department of Public Safety could have been made from the real license number and could have provided plaintiff's address, or the plaintiff could have been found listed in the telephone directory. The simplest thing that the defendant could do would have been to report the crime to the police and allow them to use their investigative resources. Further, the return of the notice as being a false address should have put the defendants on further inquiry that the identity was also false, i.e., not the true identity of the perpetrator, so that further inquiry was necessary. The bedrock of probable cause is that "it must be more than mere conjecture or unfounded suspicion [that the suspected identity is, in fact, the perpetrator]." *Melton v. LaCalamito*, supra at 824 (2) (b); see also *McGonagil v. Treadwell*, supra at 854; *Jones v. Parrish*, supra at 568 (1). Here, there was nothing but an unverified suspicion that the perpetrator and the identity "Grant J. Nicholl" were one and the same person. This raised an issue of probable cause, because two reasonable inferences could be drawn from the presence of the name, "Grant J. Nicholl", i.e., that this was the identity of the perpetrator or that it was not the identity of the perpetrator but either a false identity or a real identity used to conceal the perpetrator's identity. See *Kviten v. Nash*, supra at 591; *Sirmans v. Peterson*, supra at 709.

These factors

> raised a jury question as to whether a reasonably prudent person would have made further inquiry [to determine the identity of the perpetrator] before prosecuting. *Sanfrantello v. Sears, Roebuck & Co., Inc.*, [supra]. *Bi-Lo, Inc. v. Stanciel*,

148 Ga. App. 614, 615 (251 SE2d 834) (1979).

(Punctuation omitted.) *Melton v. LaCalamito*, supra at 824 (2) (b); see also *Atlantic Zayre v. Meeks*, supra at 269. Such factors in this case go to the existence of probable cause and to the lack of probable cause, so that the jury may infer malice. See *Atlantic Zayre, Inc. v. Meeks*, supra at 269; *Kviten v. Nash*, supra at 591 (5). Instead of charging a known suspected perpetrator, the defendants charged an "identity." Thus, the trial court erred in granting summary judgment. *McGonagil v. Treadwell*, supra at 854 (2); *Jones v. Parrish*, supra at 568-569 (1).

2. The second enumeration of error is that the trial court erred in finding that the defendants had immunity under OCGA § 16-9-20 (h) (1). We agree.

Prior to the codification of the Official Code of Georgia, OCGA § 16-9-20 (h) (1) was enacted by the General Assembly as part of the "Financial Institutions Code of Georgia." Ga. L. 1974, pp. 705, 963-964, § 1. The caption stated the purpose of the Act to be "to provide certain protection to those initiating arrests and prosecutions on bad check charges." Ga. L. 1974, pp. 705, 715.

In construing legislation, "nothing is more pertinent, towards ascertaining the true intention of the legislative mind in the passage of the enactment, than the legislature's own interpretation of the scope and purpose of the act, as contained in the caption. The caption of an act of the legislature is properly an index to the contents of the statute as construed by the legislature itself, — a summarizing of the act, made right at the time when the discussion of every phase of the question is fresh in the legislative mind." [Cits.]

*Copher v. Mackey*, 220 Ga. App. 43, 45 (4) (467 SE2d 362) (1996); see also *Sovereign Camp Woodmen of the World v. Beard*, 26 Ga. App. 130 (105 SE 629) (1921); *Wimberly v. Ga. Southern &c. R. Co.*, 5 Ga. App. 263, 265 (2) (63 SE 29) (1908).

OCGA § 16-9-20 (a) (2) (A) reads

[n]otice mailed by certified or registered mail evidenced by return receipt to the person at the address printed on the instrument or given at the time of issuance shall be deemed sufficient and equivalent to notice having been received as of the date on the return receipt *by the person making, drawing, uttering, executing, or delivering the instrument.*

(Emphasis supplied.) While the notice is sent to the person whose address is on the check, the notice is effective only as to "the person

making, drawing, uttering, executing, or delivering the instrument." Id. OCGA § 16-9-20 (h) (1) reads

> [a]ny party holding a worthless instrument and giving notice in substantially similar form to that provided in subparagraph (a) (2) (B) of this Code section shall be immune from civil liability for the giving of such notice and for proceeding as required under the forms of such notice . . . [i]n any civil action for damages which may be brought *by the person who made, drew, uttered, executed, or delivered such instrument*[.]

(Emphasis supplied.) See generally *Tallman v. Hinton*, 220 Ga. App. 23 (467 SE2d 596) (1996); *Grand Union Co. v. Edwards*, 217 Ga. App. 154 (456 SE2d 736) (1995). Thus, the General Assembly provided immunity only against suit brought by the person who made, drew, uttered, executed, or delivered the check, but did not exclude suit by an innocent party whose name was forged to a fraudulent account created in their identity. Such interpretation would constitute an impermissible judicial extension of the Act.

This was not a legitimate account that the plaintiff had opened and closed, leaving unused checks that a third party could use, but was a fraudulently created account which criminally used the plaintiff's identity. Further, this was not a case where plaintiff had actually received notice of the bad checks being passed on his account after it was closed. In this case, the facts and circumstances did not clearly come within the express language of the immunity dealing with closed accounts. Therefore, *Grand Union Co. v. Edwards*, supra, is distinguished from this case, both on the law and on the facts. OCGA § 16-9-20 (h) (1); *Grand Union Co. v. Edwards*, supra at 155-156.

Clearly and unambiguously, the immunity under OCGA § 16-9-20 (h) (1) applies only to suits by those who "made, drew, uttered, executed, or delivered such instrument," and not to persons who were the victim of "financial identity fraud." See OCGA § 1-3-1 (a), (b); *Tallman v. Hinton*, supra at 25. "Statutes should be read according to the natural and most obvious import of the language, without resorting to subtle and forced constructions, for the purpose of either limiting or extending their operation." (Citations and punctuation omitted.) *Burbridge v. Hensley*, 194 Ga. App. 523, 524 (1) (391 SE2d 5) (1990). This immunity is now part of a criminal statute and is also in derogation of common law; therefore, the Act must be strictly construed against the person seeking its protection and cannot be extended by judicial construction. See OCGA § 1-3-1; *Atlantic Coast Line R. Co. v. State*, 135 Ga. 545, 561-562 (3) (69 SE 725) (1910), aff'd,

234 U. S. 280 (34 SC 829, 58 LE 1312) (1914); *Holland v. State*, 34 Ga. 455, 457-458 (1866). "[W]here a statute gives a right which did not exist at common law, it must be limited strictly to the meaning of the language employed, and not extended beyond the plain and explicit terms of the statute." (Citations omitted.) *Honeycutt v. Edwards*, 136 Ga. App. 486, 487 (1) (221 SE2d 678) (1975); see also *Heyman v. Heyman*, 19 Ga. App. 634 (92 SE 25) (1917); *Haralson v. Speer*, 1 Ga. App. 573, 575 (58 SE 142) (1907).

Further, OCGA § 16-9-20 (h) (1) must be construed in pari materia with OCGA § 16-9-120 et seq., the Financial Identity Fraud Act.[1] When the General Assembly passed the Financial Identity Fraud Act, it was aware that perpetrators were fraudulently using victims' financial identities to perpetrate crimes against victims and third parties, using the victims' identities. However, the General Assembly did not intentionally extend immunity under OCGA § 16-9-20 (h) (1) to include victims who had their identities stolen to create false checking accounts and to pass bad checks using the fraudulently obtained identities. See generally *Monticello, Ltd. v. City of Atlanta*, 231 Ga. App. 382, 383-384 (499 SE2d 157) (1998); *Ga. Pub. Svc. Comm. v. ALLTEL-Ga. Commun. Corp.*, 227 Ga. App. 382, 385 (1) (489 SE2d 350) (1997). Nor did the General Assembly in any of the many recent amendments to OCGA § 16-9-20 (h) (1) expressly extend such immunity. See Ga. L. 1996, pp. 748, 760-761, § 10; 1014-1015, §§ 1, 2; Ga. L. 1995, pp. 910-911, §§ 1, 2; Ga. L. 1994, pp. 1787, 1788-1795, § 3; Ga. L. 1990, pp. 8, 15, § 16.

In 1974, when it created the immunity, the General Assembly was faced only with the problem of tort actions for prosecution of bad checks, arising from making, drawing, uttering, executing, and delivering bad checks. By 1998, the General Assembly was faced with many innocent victims who had their financial identities fraudulently used by criminals. The General Assembly intentionally did not extend immunity to encompass such victims of Financial Identity Fraud because, in order to establish probable cause, reasonable inquiry to verify the perpetrator's identity and to avoid further victimizing the innocent victim should be made by anyone seeking to prosecute. "The court also considers the law as it existed before the statute was passed and identifies the mischief sought to be corrected. [Cit.]" *Telecom USA v. Collins*, 260 Ga. 362, 364 (1) (393 SE2d 235) (1990); see also *Ga. Pub. Svc. Comm. v. ALLTEL-Ga. Commun. Corp.*, supra. Thus, the General Assembly must be presumed to have acted

---

[1] Although the effective date of OCGA § 16-9-120 et seq., Ga. L. 1998, p. 865, § 2, was July 1, 1998, long after the alleged tort occurred, such Act may be considered in determining the intent of the General Assembly in earlier legislation. See *Porquez v. Washington*, 268 Ga. 649, 652, n. 2 (492 SE2d 665) (1997).

with full knowledge of the existing law, OCGA § 16-9-20 (h) (1), and the mischief sought to be corrected, financial identity fraud. *Copher v. Mackey,* supra at 44 (2).

Therefore, for all of the foregoing reasons, the General Assembly did not intend OCGA § 16-9-20 (h) (1) to give immunity against actions by persons whose identities had been fraudulently used. The trial court erred in granting summary judgment based upon a judicial extension of immunity under OCGA § 16-9-20 (h) (1).

*Judgment reversed. Pope, P. J., concurs. Smith, J., concurs in judgment only.*

DECIDED MAY 11, 1999.

*Simmons & Simmons, Annie R. Simmons,* for appellant.
*Donahue, Hoey, Rawls, Skedsvold & Richards, Charles H. Richards, Jr., Dana F. McBride,* for appellees.