**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**March 21, 2013**

# In the Court of Appeals of Georgia

A12A1877. TAYLOR v. THE STATE.

BRANCH, Judge.

On appeal from her conviction for attempt and conspiracy to manufacture methamphetamine as well as possession of ephedrine and pseudoephedrine, Karen Taylor argues that the evidence was insufficient and that trial counsel was ineffective because his law partner[1] represented Taylor's co-defendant in the same matter. Taylor also argues that the trial court erred when it failed to merge two counts for sentencing purposes, held a portion of voir dire outside the presence of counsel, and admitted evidence of a similar transaction. We find no reversible error and affirm.

---

[1] Taylor asserts that the two attorneys were law partners, while the State argues that they were not. For the purposes of this appeal only, we assume that the two were law partners.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." (Citation omitted.) *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004). We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979).

In *Hargis v. State*, __ Ga. App. __ (735 SE2d 91) (2012),[2] we set out many of the facts relevant to this appeal as construed in favor of the jury's verdict against Taylor and her co-defendant, Anthony Hargis:

> [I]n June 2006, after reviewing records concerning Hargis's transactions on ebay between September 2003 and March 2006, including the purchase of a number of items used in methamphetamine manufacture, a drug enforcement agent obtained a warrant to search the house where

---

[2] In that decision, we reversed the denial of Hargis's motion for new trial on the ground that the trial court erred when it received an ex parte communication from Taylor's appellate counsel at the hearing on Hargis's motion for new trial. Id. at __ (2). Taylor herself has raised no such issue, either below or on appeal. See *Ga. Power Co. v. Ga. Public Svc. Comm.*, 196 Ga. App. 572-573 (1) (396 SE2d 562) (1990) (complaint of ex parte communication had been waived on appeal when the issue was raised by a different party below).

2

Hargis lived with . . . Taylor. The agent found Hargis working in an outbuilding outfitted with equipment used in methamphetamine manufacture, a ventilation shaft, and a surveillance camera. Taylor arrived during the search, and both were arrested. An agent recovered a handgun from a bedroom in the house. Other evidence seized included shipping labels addressed to Hargis, a box of false identification cards with his picture on each card, over-the-counter tablets containing ephedrine and pseudoephedrine, and liquids that tested positive for the two substances. Agents also found written directions to a number of pharmacies in Taylor's handwriting. In September 2006, Hargis was charged with attempt and conspiracy to manufacture methamphetamine, possession of ephedrine and pseudoephedrine, possession of false identification, and second-degree forgery.

Taylor, who owned the house, was charged only with conspiracy to manufacture methamphetamine and possession of ephedrine and pseudroephedrine.

The history of Hargis's and Taylor's representation is a tortuous one. Soon after Taylor's arraignment in October 2006, Jeanne Davis appeared as court-appointed counsel on Taylor's behalf. At this time, Hargis was represented by the Enotah County Public Defender's Office. In September 2007, Davis was hired as an Enotah County public defender. Because both co-defendants were now represented by the same office, private counsel Joe Stauffer was appointed to assume representation of Taylor. In March 2008, Hargis hired private counsel Jeff Cox. In June 2008, Stauffer and Cox,

who were now representing Taylor and Hargis respectively, became law partners. In November 2008, Stauffer returned Taylor's representation to Davis of the public defender's office. In December 2008, Cox moved to withdraw from Hargis's case because he was not being paid, after which Hargis filed a State Bar complaint against him alleging a conflict arising from Stauffer's previous representation of Taylor. The trial court granted Cox's motion.

On February 18, 2009, a consent order was entered severing Hargis's and Taylor's cases for trial. When Hargis did not appear at the trial scheduled for February 23, 2009, a bench warrant was issued for his arrest.[3] *Hargis*, supra at __. In April 2009, Taylor retained Stauffer for a second time after waiving any conflicts arising from Cox's representation of Hargis.

Taylor later testified that Hargis returned to her house on July 29, 2009, and spent the night there. On the next day, acting on a tip, police located Hargis in a truck belonging to Taylor and arrested him for obstruction after he refused to identify himself. *Hargis*, supra at __. Police then searched the truck, recovering ephedrine,

---

[3] One of Taylor's character witnesses later testified that she saw Taylor and Hargis together at a store at some point in the spring of 2009, when Hargis was wanted for failure to appear at the scheduled February trial.

lighter fluid, brake cleaner, and 17 identification cards bearing Hargis's photograph. See id. at ___.

> Based on [this] evidence . . . , police obtained a search warrant for Hargis's house and found boxes containing devices for manufacturing and smoking methamphetamine, one of which contained the drug. A tape recorder and cassette tape were also seized. Conversations on the tape included Hargis instructing Taylor on the use of the recorder, Taylor's conversations with her counsel, and their negotiations with prosecutors assigned to the case.

Id. at ___. Shortly after Hargis's July 30, 2009 arrest, Cox, who was still practicing law with Stauffer, appeared on Hargis's behalf for the second time. On August 12, 2009, Taylor and Hargis signed waivers of any conflict arising from the partners' co-representation of each of them.

After the State moved to vacate its earlier motion to sever Hargis's and Taylor's cases, Stauffer and Taylor agreed that appearing with Hargis as a co-defendant would allow Taylor to argue that "she wasn't involved." Taylor's and Hargis's cases were thus rejoined for trial without objection from either co-defendant. At the same pretrial hearing at which the cases were rejoined, the trial court ruled that evidence of the events incident to Hargis's July 2009 arrest were admissible as a similar transaction to show intent and course of conduct. Hargis also moved to suppress the evidence

5

seized in July 2009 as the product of an illegal search. The trial court denied the motion. See *Hargis*, supra at __.

> On the first day of [the co-defendants'] trial on the 2006 charges, held in late September and early October 2009, and in addition to the evidence directly supporting those charges, the State moved to admit evidence of Hargis's failure to appear at the February 2009 trial as indicating consciousness of guilt as well as the tape seized in July 2009 for the purpose of showing the existence of a conspiracy [to manufacture methamphetamine] between Taylor and Hargis. The court ruled the tape admissible for the limited purpose of showing the existence of a conspiracy.

Id. at ___. After a jury found Taylor guilty on all three counts, she was convicted and sentenced to 30 years with 15 to serve.

Davis, who had represented Taylor twice before in the case, was appointed as Taylor's first appellate counsel and filed a motion for new trial on her behalf. At a joint hearing on Hargis's and Taylor's motions for new trial, Taylor testified that although she felt that Hargis's second retention of Cox, which had occurred after her own second retention of Stauffer, had prejudiced Stauffer's conduct of her defense, she wanted to waive any conflicts involving Davis and the public defender's office. When Hargis refused to waive the same kinds of conflicts arising from Cox, Stauffer,

6

and the public defender's office's representations on the cases, however, the trial court ordered new counsel appointed for both Hargis and Taylor. In January 2012, second appellate counsel for Taylor filed an amended motion for new trial, which the trial court denied after a hearing. This appeal followed.

1. Taylor first argues that the evidence was insufficient to sustain her convictions for (a) attempt and conspiracy to manufacture methamphetamine and (b) possession of ephedrine and pseudoephedrine. We disagree.

(a) Taylor argues that because she rarely entered the basement where the methamphetamine ingredients were found, and because the possession of those ingredients amounted to mere preparation, the evidence was insufficient to sustain her convictions for attempt and conspiracy to manufacture the drug. We disagree.

OCGA § 16-13-30 (b) renders it "unlawful for any person to manufacture . . . any controlled substance." "A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." OCGA § 16-4-1. "An act constituting a 'substantial step' is one done in pursuance of the intent, and more or less directly tending to the commission of the crime. In general, the act must be inexplicable as a lawful act, and must be more than mere preparation." (Citation

7

omitted.) *Ogburn v. State*, 296 Ga. App. 254, 255 (1) (a) (674 SE2d 101) (2009). To prove a conspiracy to violate the controlled substances laws, including the ban on the manufacture of them,

> two elements must be shown: an agreement and an act in furtherance of it. The state need not prove an express agreement between the co-conspirators; it only must show that two or more persons tacitly came to a mutual understanding to accomplish or to pursue a criminal objective. Conspiracy may be shown through circumstantial evidence. The conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators and other circumstances, such as presence, companionship and conduct before and after the commission of the alleged offense.

(Punctuation and footnotes omitted.) *Williamson v. State*, 300 Ga. App. 538, 547-548 (5) (685 SE2d 784) (2009).

The evidence at trial, including Taylor's own testimony, supported reasonable inferences that she lived with Hargis in the house she owned both before and after the methamphetamine ingredients and equipment were found there in 2006, wrote out directions to numerous pharmacies in the area for the purpose of avoiding legal restrictions on the purchase of such ingredients, discussed with Hargis whether he should abscond from the February 2009 trial, bought him a truck in the spring of

8

2009, and invited him to stay in her house on the night before his rearrest in July 2009. Taylor's list of pharmacy directions is evidence demonstrating a substantial step toward the commission of the crime of manufacturing methamphetamine.[4] Additionally, Taylor's involvement with Hargis and the presence of methamphetamine ingredients and equipment in her house was evidence that she assisted Hargis in the criminal objective of manufacturing methamphetamine both before and after his 2006 arrest. Thus the evidence outlined above was sufficient to sustain Taylor's convictions for attempt and conspiracy to manufacture methamphetamine. See *Ogburn*, supra at 255 (1) (a) (jury could infer from defendant's possession of individually wrapped methamphetamine packages, together with large quantities of pseudoephedrine tablets and starter fluid, that he was attempting to manufacture methamphetamine); *Williamson*, supra at 548 (5) (evidence including wife's "overt act" of selling methamphetamine from the home she shared with her husband authorized a jury to infer a "tacit understanding" between the two to traffic in methamphetamine); *Jackson*, supra.

---

[4] It was for the jury, and not this Court, to evaluate the credibility of Taylor's explanation that she wrote out the directions to pharmacies for the purpose of Hargis's obtaining a flu shot

(b) Although Taylor asserts that she cannot be guilty of possession of ephedrine and pseudoephedrine, she was the owner of the house she shared with Hargis, and is thus presumed to have possessed all its contents, including the methamphetamine ingredients found there. See *Johnson v. State*, 159 Ga. App. 819, 822 (2) (285 SE2d 252) (1981). It was for the jury, and not this Court, to determine whether Taylor was credible when she testified that she rarely entered the basement where the ingredients were found and that she could not distinguish between items used in the drug's manufacture and those Hargis used for computer or vehicle repair. See id. (trial court properly denied co-defendant's motion for directed verdict because "[w]hile it might have been possible for each [co-defendant] to have set aside a part of the house as his exclusive domain, no such evidence was forthcoming"). It follows that the evidence outlined above was sufficient to support Taylor's conviction for possession of methamphetamine ingredients. See OCGA § 16-13-30.3 (b) (defining illegal possession of ephedrine and pseudoephedrine); *Inglett v. State*, 239 Ga. App. 524, 528 (6) (521 SE2d 241) (1999) (evidence was sufficient to sustain convictions of multiple defendants living in the same residence for crimes including trafficking in methamphetamine and possession of marijuana; "to the extent that various of these convictions were solely based on circumstantial evidence, such evidence authorized

the jury to find that every reasonable hypothesis except that of guilt was excluded");

*Jackson*, supra. Compare *Aquino v. State*, 308 Ga. App. 163, 166-168 (1) (706 SE2d 746) (2011) (reversing defendant's conviction for trafficking in methamphetamine in the absence of evidence that he was ever seen in proximity to drugs or drug making equipment found in a house of which he was neither the owner nor the lessee).

2. As in her motion for new trial, Taylor argues that she was denied her right to effective assistance of counsel because Stauffer had an actual conflict of interest in that he had represented her while Cox was simultaneously representing Hargis, allegedly in violation of the Georgia Bar Rules and the Georgia Rules of Professional Conduct.[5] As a result of this alleged conflict, Taylor asserts, Stauffer failed to press Taylor's case as zealously as he should have. We disagree.

As the United States Supreme Court held in *Cuyler v. Sullivan*, 446 U. S. 335 (100 SC 1708, 64 LE2d 333) (1980):

> Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances,

---

[5] See, e.g., Georgia Rules of Professional Conduct, Rule 1.7 (a) ("A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, former client, or a third person will materially and adversely affect the representation of the client").

11

therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

(Citations omitted.) Id. at 346 (IV) (A).

Thus when a defendant raises no objection to an alleged conflict during trial, he must demonstrate on appeal both the existence of an actual conflict and its significant effect on counsel's performance. Id. at 348 (IV) (B). In *State v. Abernathy*, 289 Ga. 603 (715 SE2d 48) (2011), for example, the Supreme Court of Georgia reversed a trial court's grant of a new trial when a defendant could not show "actual harm" arising from the simultaneous representation of two co-defendants by two lawyers working in the same public defender's office. Id. at 604 (1). Our Supreme Court held that "a defendant asserting ineffective assistance of counsel based on an actual conflict of interest must demonstrate that the conflict of interest existed and that it significantly affected counsel's performance." (Citation and punctuation omitted.) Id.

[T]he critical question is whether the conflict significantly affected the *representation*, not whether it affected the outcome of the underlying *proceedings*. That is precisely the difference between ineffective

12

assistance of counsel claims generally, where prejudice must be shown, and ineffective assistance of counsel claims involving actual conflicts of interest, which require only a showing of a significant effect on the representation. A significant effect on the representation may be found, for example, where counsel is shown to have refrained from raising a potentially meritorious issue due to the conflict; where counsel negotiates a plea bargain for more than one defendant in a case conditioned on acceptance of the plea by all such defendants; or where one of the State's witnesses was a current client of defense counsel in an unrelated criminal matter, thereby constraining counsel's ability to cross-examine the witness.

(Citations and punctuation omitted; emphasis in original.) Id. at 604-605 (1).

Even in cases involving the simultaneous representation of two co-defendants by the same lawyer, a defendant seeking to demonstrate a deprivation of the right to counsel "must show that an actual conflict existed which adversely affected the attorney's performance[.]" (Citation omitted.) *Griggs v. State*, 262 Ga. 766, 769 (4) (b) (425 SE2d 644) (1993). Thus, although "joint representation by one attorney of two or more defendants whose defenses are antagonistic is impermissible where an actual conflict of interest adversely affects the attorney's performance," *Burns v. State*, 281 Ga. 338, 339-340 (638 SE2d 299) (2006) (citation omitted), "counsel from the same [law firm] are not automatically disqualified from representing multiple

13

defendants charged with offenses arising from the same conduct." Id. at 340. And "[w]here defendants state on the record [below] that they have discussed the case with counsel, that there is no conflict of interest and that they are satisfied to proceed with one counsel, any error was induced by the defendants' statements." (Citation omitted.) *Brumelow v. State*, 239 Ga. App. 119, 123 (6) (520 SE2d 776) (1999).

(a) Even assuming that Taylor has shown the existence of an actual conflict arising from Stauffer's representation of her at the same time Cox was representing Hargis, both she and Hargis explicitly waived any conflicts arising from Stauffer's and Cox's prior and simultaneous representations of each of them before proceeding to a consolidated trial. It follows that any error in allowing the joint trial to proceed was induced and thus cannot provide the basis for a claim that counsel was ineffective. *Brumelow*, supra at 123 (6).

(b) Taylor asserts that her waiver was ineffective because the risks of the joint representation were never explained to her.[6] Even assuming that she is correct,

---

[6] See Rules of Professional Conduct, Rule 1.7 (c) ("Client consent is not permissible if the representation: (1) is prohibited by law or these rules; (2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or (3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients.").

14

however, Taylor has failed to show that her defense was compromised by that joint representation.

Although Taylor asserts (without citation to the record) that her viewpoint was "antagonistic" to Hargis's, the record shows that neither Hargis's cross-examination of Taylor nor his closing argument suggested that she was involved in any criminal activity; in fact, Hargis insisted in closing that neither defendant had committed any crime. Likewise, and despite Taylor's critique of Stauffer's "minimal" defense efforts, including not calling Hargis to the stand, the hearing on her motion for new trial shows that Stauffer and Taylor authorized Cox to "take the lead" before and at trial as part of a reasonable strategy to present Hargis as "the main character in this play" with Taylor "not being as involved." Stauffer's strategy, taken in consultation with Taylor, was to get to trial as quickly as possible: Taylor "was ready to be found innocent and get out of jail," and more evidence existed against Hargis than against Taylor, such that "people would see all the things that he had done and relatively little of what she had done . . . . [T]hat was the trial strategy." The plan included agreement to a consolidated trial, which in Stauffer's judgment would bolster an argument that Hargis "ha[d] done everything" whereas Taylor had "not done anything," but was merely "naive." Finally, because "it would have been difficult" to put Hargis on the

15

stand, thus risking the kind of extensive cross-examination to which the State subjected Taylor herself, Stauffer concluded that Taylor's wiser course was not to call Hargis as a witness.

As our Supreme Court held in *Burns*, where there was no "finger pointing" between co-defendants, and where "both counsel pursued the same defense strategy that their respective clients were innocent[ ]," no actual conflict of interest arises from a single counsel's co-representation of clients at the same trial. *Burns*, supra at 340-341. Moreover, "[w]hich witnesses to call and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his client, and whether an attorney's trial tactics are reasonable is a question of law, not fact." (Citations omitted.) *Crawford v. State*, 302 Ga. App. 782, 784 (2) (691 SE2d 660) (2010). Here, as we have noted, there were abundant reasons for Taylor to undertake a strategy of allowing Hargis's criminal activity to assume a leading role at a consolidated trial. For both of these reasons, we conclude that Taylor has failed to show that any actual conflict between her own and Hargis's interests "caused divided loyalties" or "compromised" Stauffer's representation of her at the same time that Cox represented Hargis. See *Abernathy*, supra at 605 (1). It follows that the trial court did not clearly err when it denied Taylor's motion for new trial on this ground.

16

3. Taylor also argues that the trial court should have merged the counts on attempt to manufacture methamphetamine (Count 1) and possession of ephedrine and pseudoephedrine (Count 3) because the two offenses were based on the same conduct and evidence. We disagree.

Under OCGA § 16-1-7 (a), "[w]hen the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime." The accused may not, however, be convicted of more than one crime if "(1) [o]ne crime is included in the other; or (2) [t]he crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." Id.

OCGA § 16-13-30 (b) renders it unlawful "for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance." OCGA § 16-13-30.3 (d) outlaws the possession of "any amount" of ephedrine or pseudoephedrine that "have been altered from their original condition." The indictment charging Taylor and Hargis with attempt to manufacture methamphetamine specified that they had not only "obtained and assembled" but also "take[n] steps to alter" the ephedrine and pseudoephedrine. The charge on possession also asserted that the co-defendants had altered these substances with the intent to

17

manufacture the drug. The State provided evidence at trial that some of the methamphetamine ingredients had been altered.

The jury could have found Taylor guilty of both attempt to manufacture methamphetamine and possession of ephedrine and pseudoephedrine based on different conduct – here, that she assembled methamphetamine ingredients with intent to manufacture the drug, and also that she possessed some part of those ingredients after altering them. It was not necessary for the State to prove the surplusage in each count – the allegation of alteration in that count alleging attempted manufacture, or the allegation of intent to manufacture in the possession count – in order to obtain separate convictions for the two crimes. See *Fair v. State*, 284 Ga. 165, 167 (2) (a) (664 SE2d 227) (2008) ("An allegation in an indictment that is wholly unnecessary to constitute the offenses charged is mere surplusage."). Because the evidence supported a conclusion that different conduct by Taylor resulted in the commission of both attempted manufacture of methamphetamine and possession of ephedrine and pseudoephedrine, the two crimes do not merge. See *Dahlman v. State*, 311 Ga. App. 465, 466-467 (716 SE2d 538) (2011) (convictions for manufacturing methamphetamine and possessing substances used to manufacture the drug with intent did not merge because defendant "had already completed the manufacture of

18

methamphetamine" while other evidence showed that "he possessed [other] substances with the intent to use them to manufacture more methamphetamine in the future"); compare *Gooch v. State*, 249 Ga. App. 643, 648 (5) (549 SE2d 724) (2001) (vacating conviction for both possession of methamphetamine and possession with intent to distribute and remanding for resentencing where the two counts were proven "with the same facts").

4. Taylor also argues that the trial court erred when it held a portion of voir dire and excused a law enforcement officer when neither she nor her counsel was present. We disagree.

As effective during the conduct of the 2009 trial at issue, former OCGA § 15-12-1 (a) (1) provided:

> Any person who shows that he or she will be engaged during his or her term of jury duty in work necessary to the public health, safety, or good order or who shows other good cause why he or she should be exempt from jury duty may be excused by the judge of the court to which he or she has been summoned or by some other person who has been duly appointed by order of the chief judge to excuse jurors.[7]

---

[7] The statute was amended in 1984 to remove a previously existing exemption of police officers from jury duty. Former OCGA § 15-12-1 was recodified in 2011 as OCGA § 15-12-1.1. See see Ga. L. 1984, p. 1697; Ga. L. 2011, p. 59, § 1-5.

19

Because statutes regulating the selection of jurors are "merely directory" rather than mandatory, the outcome of the process will not be set aside unless there is evidence that the court's practice of excusing jurors is executed "in such a manner as to alter, deliberately or inadvertently, the representative nature" of the jury lists. (Footnote omitted.) *Franklin v. State*, 245 Ga. 141, 146-147 (1) (263 SE2d 666) (1980) (rejecting defendant's attack on court clerk's handling of juror exemptions and excuses when there was no evidence that the representative nature of the jury lists was affected).

The record shows that the judge told the prosecutor that the judge would not be "doing selection" but rather that she was merely going to "greet" the jury pool before voir dire. As a result, neither Taylor nor her counsel were present when a venireman who worked in law enforcement was excused.

Like the Supreme Court of Georgia, "we do not condone [the] practice" of conducting voir dire outside the presence of a defendant or counsel. See *Robertson v. State*, 268 Ga. 772, 774 (4) (493 SE2d 697) (1997) (trial court met with prospective jury members prior to voir dire, in the absence of defendant and his lawyer, and asked whether they were citizens of the county, whether they had served on the grand jury, and whether they would suffer any hardship if chosen to serve). Given that Taylor has

20

made no showing of any systematic and adverse impact on the representative nature of the jury lists as a result of this judge's conduct of voir dire in this or other cases, and that the trial court's engagement with these prospective jurors was limited to investigating valid statutory grounds for excusing them, the court did not err when it excused the prospective juror at issue as a law enforcement officer engaged in work necessary for public safety. See id.; former OCGA § 15-12-1 (a) (1).

5. Finally, Taylor argues that the trial court erred when it admitted the evidence seized in 2009 as a similar transaction because the State did not produce sufficient proof that she committed the independent offenses of obtaining methamphetamine ingredients and attempting or conspiring once again to manufacture the drug. Again, we disagree.

> Before any evidence of independent offenses may be admitted, the trial court must conduct the hearing required by USCR 31.3 (B) and the state must show: (1) that it seeks to introduce the evidence not to raise an improper inference as to the defendant's character but for some proper purpose; (2) that there is sufficient evidence to establish that the defendant committed the independent offense; and (3) that there is a sufficient connection or similarity between the independent offense and the crime charged so that proof of the former tends to prove the latter.

21

*Williamson*, supra at 541 (2), citing *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). "We review the trial court's determination that the similar transaction evidence was admissible under an abuse of discretion standard." (Footnote omitted.) *Williamson*, supra at 542 (2) (b).

We note that Taylor has not raised the issue whether the evidence seized in July 2009 was the product of an illegal search. Compare *Hargis*, supra at __ (3) (addressing legality of July 2009 search as an issue likely to recur on retrial). The issue presented here is whether the State produced sufficient evidence that Taylor was involved, either as a co-conspirator or as a party, in (a) possession of the methamphetamine ingredients found immediately after Hargis's July 2009 arrest for obstruction in the truck he had borrowed from Taylor and (b) possession of the methamphetamine manufacturing equipment found in the house immediately thereafter.

Construed in favor of the trial court's ruling, the record, including Taylor's own testimony, supports a conclusion that in July 2009, Hargis was present at Taylor's house with Taylor's knowledge and consent on the night before the manufacturing equipment was found and that Hargis used her truck to transport the manufacturing equipment there. Even if there are some differences, such as the circumstances of

22

Hargis's arrest, between the events of 2006 and those of 2009, "the proper focus is on the similarities, not the differences, between them." (Footnote omitted.) *Williamson*, supra at 543 (2) (b). Thus we cannot say that the trial court abused its discretion when it ruled that the State had provided sufficient evidence of Taylor's involvement in the 2009 offenses. Id.

*Judgment affirmed. Miller, P. J., and Ray, J., concur.*